JRY CORPORATION & others[1] *vs.* EDWARD G. LEROUX, JR.,
& others.[2]

Suffolk. February 14, 1984. — May 30, 1984.

Present: GREANEY, C.J., CUTTER, & WARNER, JJ.

*Contract*, Construction, What constitutes, Option. *Partnership*, Limited
   partnership, General partner, Consent of limited partner, Withdrawal of
   partner. *Fiduciary. Conflict of Interest. Words*, "Attempt."

Where two partnership agreements provided that the right of limited partners
   to amend the agreements could be lawfully exercised only after counsel
   for the partnerships had furnished a legal opinion that the exercise of
   such rights would not adversely affect either the limited liability of any
   limited partners or the partnerships' tax status, this requirement was not
   satisfied by the opinion of an attorney retained by a group of limited
   partners, representing a majority of the limited partnership units, who
   acted independently and without the knowledge of two of the partner-
   ships' three general partners, a majority of whom, under the agreements,
   was necessary to the valid selection of the partnerships' attorney.
   [156-159]
Amendments to two partnership agreements which were proposed by a
   group of limited partners controlling a majority of the limited partnership
   units and which purported to alter the existing control and operation of
   the partnerships by placing their management under the exclusive control
   of a managing general partner and, in effect, confining the two other
   general partners to strictly advisory functions, would violate restrictions
   in the partnership agreements which prohibited the limited partners from
   taking any action which would interfere with "the control, conduct or
   operations of the Partnership[s] and [their] business" by the general
   partners. [159-162]
The conduct of a group consisting of certain limited partners of two
   partnerships provided grounds for invoking provisions of the respective
   partnership agreements for involuntary withdrawal of any limited partner
   for "interference . . . in the management of partnership affairs," where

---

[1] Additional plaintiffs include Haywood C. Sullivan; Jean R. Yawkey `
and John L. Harrington as trustees of the Jean R. Yawkey Trust; Thomas
DiBenedetto; H.M.S., Inc.; Samuel Tamposi; and Dexter Shoe Company.

[2] Additional defendants include Ball One, Incorporated; Strike One, Incor-
porated; and Albert F. Curran, a lawyer.

the limited partners had sought to have the partnership agreements amended in a manner which would drastically alter the management and control of the partnerships and, thereafter, relying on the amendments as effective in all respects, had participated in a seizure of control of the partnerships' business and in a public announcement that the group had taken control. [163-165]

Where a general partner in two partnerships had participated with a group consisting of certain limited partners in an effort to seize control of the business of the partnerships in a manner adverse to the interests of the two other general partners and destructive of their rights, this general partner was held to have violated the strict fiduciary duty owed by him to the other general partners, and thus was precluded from voting with them on the question whether to invoke provisions of the partnership agreements for involuntary withdrawal of limited partners for "interference . . . in the management of partnership affairs." [165-168]

A letter from a prospective buyer of the interests of a general partner in two partnerships, addressed to the general partner and assented to by him, which recited that the partner had granted to the prospective buyer, for a period of thirty days, "the exclusive right to negotiate" for purchase of his interests, upon stated terms and conditions "and, if we reach agreement . . . the exclusive right to purchase such interests" did not, in the circumstances, constitute an "attempt to sell" which would trigger certain rights conferred upon the two other general partners by the partnership agreements, entitling them to buy out the general partner's interests. [168-173]

CIVIL ACTION commenced in the Superior Court Department on June 7, 1983.

The case was heard by *Lynch*, J.

*Daniel L. Goldberg (Justin P. Morreale, Kitt Sawitsky, Wayne D. Bennett & Jonathan M. Albano* with him) for JRY Corporation & others.

*James D. St. Clair (John F. Batter, III, & Donald K. Stern* with him) for Ball One, Incorporated & another.

*Bernard A. Dwork* for Edward G. LeRoux, Jr. *(James R. DeGiacomo,* for Albert F. Curran, with him).

GREANEY, C.J. This appeal involves the ownership of the Boston Red Sox baseball club. The case was heard by a judge of the Superior Court sitting without a jury, who, after a seven-day trial, entered a comprehensive memorandum of decision consisting of seventy-eight pages of findings of fact and thirty-

five pages of legal analysis. The parties have cross-appealed from the judgment entered pursuant to the memorandum.

The judge's findings of fact are not disputed in any material respect. See Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974); *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977). We shall not attempt to summarize the findings except as they become relevant to particular issues. We provide at this point the following general outline.

The Boston Red Sox baseball club (BRS) is owned by a Massachusetts limited partnership formed pursuant to G.L. c. 109 by an agreement dated May 23, 1978, and amended on October 4, 1980, and September 1, 1982. The three general partners of BRS are Haywood C. Sullivan, Edward G. LeRoux, Jr., and JRY Corporation (JRY), a Delaware corporation with a principal place of business in Dedham (JRY is wholly owned by Jean R. Yawkey). The limited partners of BRS include Ball One, Incorporated (Ball One), a corporation owned by Rogers Badgett; Strike One, Incorporated (Strike One), a corporation owned by both LeRoux and Badgett; Albert F. Curran; and Jean R. Yawkey and John L. Harrington as trustees of the Jean R. Yawkey Trust.[3] These same general and limited partners also control New England Associates (NEA), a Massachusetts limited partnership formed pursuant to an agreement dated August 1, 1982.[4] The NEA partnership essentially mirrors the provisions of the BRS partnership.[5]

The principal antagonists in this dispute are the Yawkey-Sullivan interests (Yawkey group) on the one hand, and the

---

[3] The limited partners also include Thomas DiBenedetto; H.M.S., Inc.; Samuel Tamposi; and Dexter Shoe Company. These limited partners were permitted to intervene in the action on the side of the plaintiffs.

[4] NEA is affiliated with Storer Broadcasting and the Boston Bruins for the purpose of producing broadcasts of sporting events on a cable sports network.

[5] While there are some minor differences between the two partnership agreements, nothing in the outcome of this case turns on such differences. We note, however, that the agreements appear to contain provisions somewhat different from the usual limited partnership arrangement. As a consequence, the appeal will be more concerned with the construction of the language in the agreements than with principles of partnership law.

LeRoux-Badgett-Curran interests (LeRoux group) on the other. Starting in 1981, serious differences of opinion arose between the two groups over the management of the team and its associated enterprises. These problems centered at first on differing philosophies as to how the BRS partnership should be managed but soon evolved into harsh personality conflicts as well. The disagreements festered throughout 1982 and into 1983 when a series of moves and countermoves by the parties led members of the LeRoux group: (a) to put forth, on June 6, 1983, amendments to the partnership agreements designed to restructure management of the enterprises, and (b) to sign, on May 2, 1983, a letter with one David G. Mugar concerning the possible sale of the interests held by LeRoux and Badgett in BRS and NEA to Mugar. Those events precipitated actions seeking a declaration of the rights of the parties, the trial of which led the judge to restore the status quo existing prior to the June 6 amendments.

The appeals raise three broad issues: (1) whether the judge correctly ruled that the amendments to the partnership agreements put forth by the limited partners in the LeRoux group on June 6, 1983 (June 6 amendments) were invalid; (2) whether the limited partners who proposed the amendments are subject to the involuntary withdrawal provisions of the agreements; and (3) whether LeRoux's actions, in negotiating with Mugar, triggered other provisions of the agreements which would permit his general partnership interests to be bought out by JRY and Sullivan.

1. *The Validity of the June 6, 1983, Amendments.*

The first question concerns the judge's ruling that the June 6 amendments are invalid. The pertinent provisions of the amendments are contained in the Appendix to this opinion at Appendix I. We conclude that the judge's ruling is sound.

(a) *Background facts.* Due to growing hostility and discontent within the partnerships, Badgett (through Ball One and Strike One), LeRoux (through Strike One), and Curran decided to take unilateral action to change the management and control of BRS and NEA partnerships. These parties (amending limited partners) control a majority of the thirty limited partnership

units in each of the two partnerships.[6] Prior to June 6, 1983, amendments to the agreements were prepared by counsel for the amending limited partners which purported to alter the existing control and operation of the partnerships by placing their management under the exclusive control of one managing general partner. LeRoux was designated as this managing general partner. The judge found that the June 6 amendments were ineffective on procedural grounds and also substantively invalid because they exceeded the power of amendment conferred upon the limited partners. The LeRoux group disputes these determinations.

(b) *Procedural invalidity.* In enacting the June 6 amendments, the amending limited partners relied on § 5.8(b) of the partnership agreements as authority for their actions. See Appendix II. Section 5.8(b), however, is expressly limited by § 5.8(c) of the agreement (see Appendix II), which provides that the rights described in § 5.8(b) cannot be exercised until counsel for the partnerships has delivered opinions, see § 5.8(c)(1) and (2), Appendix II, concluding that the exercise of such rights will not result in the loss of any limited partner's limited liability or adversely affect the partnerships' tax status. (Other ways of satisfying the requirement set forth in § 5.8(c)(1) and (2) were not met and hence are not involved in this case.)

From the outset of the formation of the partnerships, Curran, although a limited partner, had served as general counsel of BRS. He had also served, on occasion, as personal counsel to LeRoux. With the intensification of hostilities within the partnerships, Curran decided, at a meeting of all the general partners held on May 21, 1983, to resign as general counsel. The previous day Sullivan and Harrington (the latter being associated with the Yawkey group), had asked Curran to restrict his activities or to resign as general counsel due to the possible conflicts of interest he faced. Curran resigned voluntarily, realizing that, as a limited partner, he potentially faced serious

---

[6] Ball One controls ten limited partnership units; Strike One, four; and Curran, two.

conflicts of interest, especially if litigation developed, because of his close ties with LeRoux and his interest as a limited partner in having the agreements amended. Curran realized that his interests conflicted with the interests of the Yawkey group whom he also represented as legal counsel. Curran also apparently recognized that any conflict of interest on his part would be exacerbated if he was asked, as general counsel, to deliver the opinions required by § 5.8(c) as a prerequisite to amendment of the agreements.

On June 1, 1983, the LeRoux group, acting independently and without the knowledge of the other general partners, retained Mr. Samuel Adams as counsel to the partnership. No vote was taken by the other general partners to approve or ratify this appointment. Mr. Adams was made aware of the amendments being prepared by the limited partners and immediately began working on the opinions to be provided by counsel called for in § 5.8(c), which he delivered on June 6, 1983. The letters expressed "no opinion regarding the validity or enforceability of the Amendment[s]," but did conclude that the rights granted by § 5.8(b)(1) of the BRS agreement, if exercised, would not result in the loss of any limited partner's limited liability or adversely affect the partnership's tax status.

Despite these opinion letters, the requirements of § 5.8(c) were not met. Section 5.1(d) of the partnership agreements (see Appendix III) vests the general partners, upon the majority vote, with the sole power "to employ such . . . attorneys . . . necessary or appropriate to carry out the business of the partnership." Since Mr. Adams' appointment was not approved by a majority of the general partners as required by § 5.1(d), he never lawfully became the partnerships' general counsel. His opinion letters thus failed to fulfill the obligatory requirements of § 5.8(c).

To circumvent this conclusion, the LeRoux group argues that LeRoux's unilateral appointment of Mr. Adams was valid since the other general partners (JRY and Sullivan), had violated their fiduciary duties by seeking Curran's resignation in bad faith in order to frustrate the limited partners' right to amend the agreements. The short answer to the argument is

found in the judge's findings (which are supported by the evidence) that Curran's resignation was voluntary and was not brought about by a violation of any fiduciary duty owed the LeRoux group by the Yawkey group.[7] The failure of proper compliance with § 5.8(c) is decisive of the amendments' validity and renders unnecessary discussion of the other procedural infirmities involved in their passage.

(c) *Substantive invalidity.* Discussion of this aspect of the June 6 amendments is necessary to set the stage for consideration in part 2 of this opinion of the agreements' involuntary withdrawal provisions. The starting point of the analysis requires focus on §§ 5.8(a) and (b) of the agreements set forth in Appendix II. Section 5.8(a) purports on its face to ban interference by the limited partners in any manner with the general partners' control, conduct, or operations of the partnerships. Section 5.8(b), on the other hand, gives the limited partners, upon their majority vote, certain rights of amendment, reserving other decisions (identified in § 5.8[d], see Appendix II), for their unanimous approval.

The judge ruled that the June 6 amendments violated the restrictions imposed by § 5.8(a). The LeRoux group contends that the judge's ruling gives an unduly broad construction to § 5.8(a). They argue that the section's provisions only restrict amendments by the limited partners which directly involve them in the day-to-day control of the partnerships' affairs and that § 5.8(b) confers virtually unfettered authority on the limited partners to amend the agreements. We are not persuaded by these contentions.

It is the usual rule that a contract must be interpreted as a whole, *King Features Syndicate, Inc.* v. *Cape Cod Bdcst. Co., Inc.,* 317 Mass. 652, 654 (1945), and construed so as to give a

---

[7] There is nothing in the agreements, including § 5.3, which gives LeRoux the authority to appoint counsel for the partnerships. Section 5.3 outlines the duties of the individual general partners and confers on LeRoux the responsibility of overseeing and supervising the partnerships' financial activities, including legal matters related to those duties. The power to appoint legal counsel is expressly reserved, however, to the collective action of the general partners in § 5.1(d) and, therefore, cannot be read into § 5.3, which allocates duties between Sullivan and LeRoux.

reasonable meaning to each of its provisions, *McMahon* v. *Monarch Life Ins. Co.*, 345 Mass. 261, 264 (1962). "One who is genuinely searching for the meaning of a document containing two unconditional provisions, one immediately following the other, would favor a reading which reconciles them. Thus, if they produce conflict when both are read as unconditional statements but consistency when one is read as qualifying the other, the latter reading, if otherwise reasonable, would be favored." *Kates* v. *St. Paul Fire & Marine Ins. Co.*, 509 F. Supp. 477, 485 (D. Mass. 1981).

Adhering to these principles, we view § 5.8(a) as intended (as its language plainly indicates) to restrict the limited partners from taking *any* action which would interfere "in any manner with, the control, conduct or operations of the Partnership[s] and [their] business" by the general partners.[8] This interpretation is supported by examination of § 5.8(b) in light of § 5.8(d), which provides that certain amendments to the agreements may only be made by unanimous limited partner approval. The latter amendments are identified in § 5.8(d) as those which: (1) increase the liability of the limited partners; (2) change their capital contributions; (3) alter the rights and interests of the limited partners in net profits and losses; and (4) alter their rights upon dissolution. We think § 5.8(d), requiring unanimity among the limited partners as to decisions which affect their fundamental rights, was meant (in the context of the agreements) to set outside limits on the amendment authority of the limited partners. Since a *unanimous* vote of the limited partners is required to affect their basic rights it would be unreasonable, in the absence of much more specific language showing an in-

---

[8] Section 5.1 of the agreements vests the control, conduct, and operations of the partnerships exclusively in the general partners, who are to govern by a majority vote. Section 5.1 details some of the decisions which are to be made by majority vote of the general partners and concludes by extending the powers of the general partners to "any and all other acts that [the general partners], in their sole discretion, deem necessary or appropriate in connection with the management of the affairs of the Partnership[s]." Section 5.1 serves to complement and confirm the broad grant of authority contained in § 5.8(a).

tentional departure from the usual structure of limited partnerships, to interpret § 5.8(b) to permit a change in the fundamental rights of the *general* partners by a *majority* vote of the limited partners.[9] We conclude that § 5.8(a) places an umbrella over the power of amendment stated in § 5.8(b), that the provisions of the latter, when read in conjunction with § 5.8(d), are intended only to confer upon the limited partners the power to amend the agreements by majority vote to affect their rights inter se, and then at most only in respects which do not impinge significantly upon the essential interests of the general partners, and that § 5.8(d) further restricts this power by requiring a unanimous vote of the limited partners for certain specified amendments. The other arguments by the LeRoux group do not persuade us that § 5.8(b) should be given any broader interpretation.[10]

---

[9] We see no merit in the LeRoux group's argument that since § 5.8(d) expressly requires a unanimous limited partner vote in only four circumstances any other amendment of the agreement may be adopted by a majority vote of the limited partners. Pursuing this construction to a logical conclusion would permit the limited partners to alter their capital contributions only by unanimous vote but would allow them to impose onerous additional capital contributions, and perhaps other burdens, on the general partners by simple majority vote. This result is inconsistent with the defined roles given the respective classes of partners in the agreement. It would also seriously intrude on the rights of the general partners and clash with the principle that a construction of an agreement which leads to an unreasonable conclusion is not to be adopted where the agreement's language is fairly susceptible of a construction that would lead to a logical and sensible result.

[10] There is nothing in the recent amendments to the Limited Partnership Act, G. L. c. 109, which confers upon the LeRoux group the powers they now seek. Section 19, of G. L. c. 109, inserted by St. 1982, c. 202, § 1, identifies certain activities which limited partners can perform and declares those activities safe harbors for purposes of limited liability. What the LeRoux group overlooks, however, is that the statute is an enabling act which only authorizes the grant of the powers therein specified by agreement if the partners so choose. See G. L. c. 109, § 18, and the Commissioners' Comment to the Revised Uniform Limited Partnership Act § 302, 6 Uniform Laws Annot. 224 (Master ed. Supp. 1984). The Act thus does not change the ability of the partners to contract among themselves for more restrictive rights and obligations than those generally permitted by the Act. Cf. *Wasserman* v. *Wasserman*, 7 Mass. App. Ct. 167 (1979). Assuming that the revised act applies to these agreements, it is clear to us that § 5.8(a) was

In planning their moves, the limited partners apparently recognized that they lacked authority to change § 5.8(a), and consequently that a different method of gaining control had to be devised. That method involved formulating amendments which named LeRoux as "Managing General Partner," provided that any successor to LeRoux in that office similarly be appointed by a majority in interest of the limited partners, and conferred upon LeRoux the exclusive right to manage virtually all phases of the partnerships' business.[11] As a result of the amendments, the majority general partner vote now needed to conduct business would no longer be required and the views of the other general partners (JRY and Sullivan) would become strictly advisory.[12] The machinery constructed by the amendments, seen for what it really is, displaces control of the enterprises through majority vote of the general partners and substitutes control by a single general partner (LeRoux), who in turn is subject to control by the limited partners comprising the LeRoux group. What the LeRoux group once characterized as "a drastic change in management" is strictly forbidden by § 5.8(a). Having so concluded, we have no need to examine the other arguments concerning the substantive invalidity of the amendments.

---

specifically intended to restrict the rights of the limited partners to control the partnership's affairs.

The LeRoux group's remaining arguments based on provisions of "blue sky" legislation which have not been adopted in Massachusetts are without merit.

[11] This transfer of power is accomplished in part by requirements that LeRoux hire a "[m]anager" and delegate authority to run the partnerships to the manager. The manager would have authority over (a) all of the matters to which, under the partnerships, Sullivan and LeRoux are to devote their attention and (b) all of the matters which, under the agreement, are to be decided by the majority vote of the general partners. Moreover, the manager would replace Sullivan as the BRS representative to the American League. Only LeRoux would have authority to hire and fire the manager.

[12] According to the amendments, LeRoux could be overruled by a unanimous vote of the general partners. This right, however, does not maintain majority rule or provide any meaningful vote to JRY and Sullivan because it requires the consent of LeRoux to overrule himself.

2. *Involuntary Withdrawal.*

The next cluster of issues concerns whether the amending limited partners (Strike One, Ball One and Curran) are subject to the involuntary withdrawal provisions of § 8.3(a) (see Appendix IV) and whether LeRoux should be allowed to vote on such withdrawal. The judge concluded that the limited partners' conduct did not provide grounds for involuntary withdrawal. He perceived "a meaningful distinction . . . between what the amending limited partners *attempted* to do and what the *effect* of their actions, if valid, would be" (emphasis in judge's decision). Based on that distinction, the judge decided that the conduct of the limited partners would bring into play the involuntary withdrawal provisions only if the amendments were valid.[13] He further reasoned that the limited partners should be afforded the right to seek to amend the agreements and litigate the validity of their amendments so long as they acted in good faith and with reasonable cause to believe that the amendments were valid. We conclude, however, that § 8.3(a) is applicable.

Sections 8.3(a) and 5.8(a) are cognate and connected and have the joint effect of permitting the general partners to remove any limited partner who interferes with the general partners' broad and exclusive rights to manage the enterprise. There is no requirement in either § 5.8(a) or in § 8.3(a) that, before the agreements' withdrawal provisions are triggered, the actions therein proscribed be undertaken by the limited partners in bad faith or with an unreasonable belief that they were valid. Instead, the pertinent language of § 8.3(a) focuses on the occurrence of a specified event ("interference . . . in the management of Partnership affairs") and establishes that fact as the condition to its operation. The amending limited partners are deemed to have been aware of the section's restrictions and they mounted their coup, suddenly and without specific warning or discussion with the general partners other than LeRoux, in the face of its explicit language. Doubtless some tolerance

---

[13] On this point, the judge had no doubt that "if the amendments were implemented, they . . . would have the effect of constituting interference with the operations and control of the partnerships by the amending limited partners."

should be afforded limited partners who seek to exercise permitted rights of amendment. The limited partners (who are experienced businessmen) should have realized, however, that their conduct was not permitted by the agreements, and, perhaps, that the amendments were not legally authorized. We see no reason why they should be relieved from the consequences of their actual conduct by judicial rewriting of § 8.3(a) of the agreements to express exculpatory standards of good faith or reasonableness.[14]

There was actual interference in the partnerships' management as proscribed by §§ 5.8(a) and 8.3(a). The actions of the amending limited partners went far beyond the drafting of amendments and their proposal to the general partners. The facts found by the judge establish that the limited partners, in disregard of the rights of JRY and Sullivan and without the latters' knowledge, actually took over management of the club and maintained control until the issuance of a preliminary injunction. In this respect, the amending limited partners began assuming managerial prerogatives even prior to putting forth the amendments by making contact with Mr. Adams to engage him as counsel to the partnerships and by inquiry of one Richard O'Connell whether he was available to become "manager" of BRS. Continuing along these lines, the amending limited partners, relying on the amendments as effective in all respects, hired Mr. Adams as counsel for the partnerships, appointed LeRoux managing general partner, hired O'Connell as the new general manager, informed the BRS staff that LeRoux was in charge, and introduced the new management at a press confer-

---

[14] This conclusion is further supported by an anomalous result following from the construction urged by the LeRoux group. The judge found, see note 13, *supra*, that the amendments would have interfered in the partnerships' management if they were found to have been lawfully adopted. The judge held that since the amendments were not lawful, their adoption did not interfere with the general partners' right to manage the partnerships. In order to find the amendments lawful, it would be necessary to find that they did not violate the restriction in § 5.8(a) against interference with the general partners' management rights, a conclusion rejected by the judge. Finding them lawful, however, would preclude involuntary withdrawal under § 8.3(a) for the exact reason stated as a basis for withdrawal in that section, creating a logical inconsistency between cognate terms of the agreement.

ence attended by members of the national and local news media.[15] Moreover, on June 6 LeRoux authorized and directed the treasurer of the Red Sox, without consulting anyone in the Yawkey group, to draw a sizeable check payable to Mr. Adams or his law firm. These actions strike us as the precise sort of interference proscribed by § 5.8(a), which invokes for the general partners the rights (and for the limited partners the consequences) provided by § 8.3(a).[16]

We come then to the question whether involuntary withdrawal can be accomplished without LeRoux's vote since the first paragraph of § 8.3 (see Appendix IV) requires the unanimous consent of the general partners to effect an involuntary withdrawal. The judge concluded that, even assuming that the limited partners' actions constituted grounds for involuntary withdrawal, LeRoux retained his right to vote. The judge reasoned that, despite LeRoux's connections with the amending limited partners, he had not violated any fiduciary duty owed to the other general partners. We disagree.

---

[15] The press conference was held on June 6, 1983, prior to a benefit game for a much respected former Red Sox player which attracted considerable attendance and media representation. The press conference was apparently designed to gain maximum exposure for the changes sought by the dissident limited partners and to freeze out JRY and Sullivan.

[16] We deem significant that § 8.3(a) does not impose a penalty or forfeiture since a limited partner who faces involuntary withdrawal will, pursuant to other provisions of the agreements, receive the fair market value of his or its interests. See note 23, *infra*.

We note some differences in the language of § 8.3(a) of the NEA agreement from the language used in the BRS agreement. The differences are not such, on our analysis of the case, to change the conclusions that grounds for involuntary withdrawal of limited partners have occurred under both agreements.

Further, we are not persuaded by the LeRoux group's contention that *Fisher* v. *Fisher*, 349 Mass. 675, 679 (1965), and cases like it, require a ruling that involuntary withdrawal in these circumstances is contrary to c. 109 and the intent of the parties. As previously noted, see note 10, *supra*, the parties have consented to provisions in the agreements which impose stricter burdens than those imposed by c. 109. Moreover, the *Fisher* case did not involve a situation where the breach of duty complained of provided a ground for forcing withdrawal. The agreements here clearly provide that the breach complained of (interference with the partnership's management) constitutes a basis for requiring withdrawal.

LeRoux, as a general partner of BRS and NEA, owed to the other general partners a duty of utmost good faith and loyalty. See *Cardullo* v. *Landau,* 329 Mass. 5, 8 (1952); *DeCotis* v. *D'Antona,* 350 Mass. 165, 168 (1966); *Donahue* v. *Rodd Electrotype Co.,* 367 Mass. 578, 593 (1975). That rigorous duty received its classic formulation by Chief Judge Cardozo in *Meinhard* v. *Salmon,* 249 N.Y. 458, 463-464 (1928), in these terms: "[C]opartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary duties. . . . Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." This strict fiduciary duty restricts the actions of partners so that they "may not act out of avarice, expediency or self-interest in abrogation of their duty of loyalty to the other [partners]." *Donahue,* 367 Mass. at 593. General authorities on the fiduciary duties of partners also repeat the principles. See Crane & Bromberg, Partnership § 68 (1968); Beane, The Fiduciary Relationship of a Partner, 5 J. Corp. Law 483 (1980); Note, Fiduciary Duties of Partners, 48 Iowa L. Rev. 902 (1963). In the corporate area (where generally speaking a somewhat less strict fiduciary duty is involved, see the *Donahue* case at 593-594), it has been held that "[w]here [a] director's duty of loyalty to the corporation is in conflict with his self-interest the court will vigorously scrutinize the situation." *American Discount Corp.* v. *Kaitz,* 348 Mass. 706, 711 (1965). See *Sagalyn* v. *Meekins, Packard & Wheat Inc.,* 290 Mass. 434, 439 (1935); *Winchell* v. *Plywood Corp.,* 324 Mass. 171, 177-178 (1949). A finding of disabling conflict does not depend upon a finding of fraud. See the *Sagalyn* case, 290 Mass. at 439.

In *American Discount Corp.* v. *Kaitz, supra,* one William Leventhal, while treasurer of American Discount, improperly dissipated corporate assets. In a vote taken by the board of directors to hire counsel to institute an action against the corporation's auditors, Leventhal voted in the negative, thereby helping to defeat the measure. In holding that Leventhal's vote must be disqualified, the court stated: "Simply analyzed, the

situation is revealed to be one of a clear conflict of interest. By his conduct Leventhal had brought himself into an antagonistic position to that of the corporation. It was in Discount's interest that an action be brought to repair the damage to its assets charged against the defendants. It was in Leventhal's interest that his conduct not be disclosed, and that its consequences be kept concealed. It thus stands emphasized that in his vote against hiring counsel Leventhal in substance was voting against the bringing of an action based upon his own shortcomings. In the very interest of fairness it was manifestly unjust for him to take a stand against redressing the wrongs for which he was mainly responsible." 348 Mass. at 711.

LeRoux's conduct amounted, as has been noted, to far more than proposals for restructure of the partnerships and the frank discussion of those proposals with the other general and limited partners. His plans, once perfected, were not presented, as would be permissible, merely for discussion in an appropriate fashion, perhaps supplemented (in the event of disagreement) by a request (pursuant to G. L. c. 231A) for declaratory relief as to their propriety, but were designed to confront the general partners with a fait accompli, announced in a flamboyant manner, which went substantially beyond acceptable behavior. By his conduct LeRoux violated fiduciary duties owed the other general partners. LeRoux has always maintained very close associations with the amending limited partners,[17] and there is no doubt that he purposely aligned his interests with them to strip the other general partners of their management rights. As discussed, the amendments were destructive of the rights reserved to the general partners. The amendments would have acted to the benefit of the amending limited partners and would

---

[17] LeRoux owns a fifty percent interest in Strike One, a corporation created solely to hold BRS limited partnership units. LeRoux has held office in Ball One. The considerable business dealings between LeRoux, Badgett and Curran are detailed in the judge's findings. Curran has, at various times, acted as general counsel to BRS and personal counsel to LeRoux. The judge also made findings that LeRoux felt an "obligation" to Badgett to do whatever was necessary to enhance the value of Badgett's limited partnership units, including, if necessary, the sale of LeRoux's general partnership interests.

have equally tended to LeRoux's financial advantage.[18] The actions taken by LeRoux were direct and adverse to the interests of the other general partners to whom he owed a duty of strict loyalty. See *Winchell* v. *Plywood Corp.*, 324 Mass. at 177-178. In the circumstances, and following the rule of the *Kaitz* case, LeRoux could not be expected to vote objectively on the question of withdrawal and it would be manifestly unjust to the other general partners to allow him to do so.[19]

3. *The Mugar Letter and § 7.4(b) Buy-out Provisions.*

The final question concerns whether the so-called "Mugar letter" constituted an "attempt to sell" LeRoux's general partnership interests. Under § 7.4(b) of the agreements (see Appendix V), an attempt to sell would have enabled JRY and Sullivan, if they so desired, to purchase LeRoux's general partnership interest.

The facts are as follows. Dating as far back as the spring of 1982, LeRoux and Badgett had made known to JRY and Sullivan that they wished to sell their interests in the partnerships. This desire was reaffirmed at a meeting of the general partners held on December 12, 1982. Through the efforts of a Red Sox player, a meeting was arranged between David G. Mugar, Harrington, and Sullivan on January 27, 1983. (Mugar in July or August, 1982, had had several discussions with the player about acquiring an interest in the Red Sox.) At the January 27 meeting Mugar expressed an interest in purchasing a BRS general partnership interest. Sullivan and Harrington

---

[18] Obtaining control of the partnerships would likely draw a higher price for the controlling limited partnership interests and LeRoux's general partnership interest if there was a desire to sell those interests. Conversely, voting in favor of withdrawal could tend to reduce the value of LeRoux's general partnership interest by requiring that they be sold separately without the value added by combination with the controlling limited partnership interests.

[19] We recognize that a general partner in a limited partnership may hold limited partnership shares and that the juxtaposition of general and limited partnership interests may at times create tension between classes of partners. We view the conflicts, which arose here because of the extreme manner in which the changes were attempted, as going beyond any conduct that may be expected or tolerated in an arrangement where simultaneous ownership of both management and investment shares is permitted.

indicated that a partnership interest would probably become available within a year. Although he did not have a clear recollection of the matter, Mugar believed it was LeRoux's general partnership interest that was being discussed.

On April 12, 1983, a few weeks after seeing an article in a local newspaper in which Mugar was identified as having an interest in buying into the Red Sox, LeRoux made contact with Mugar. Mugar expressed a desire to purchase LeRoux's general partnership interest. Negotiations followed between Mugar, LeRoux and Badgett culminating in the "Mugar letter."

This letter, signed by Mugar and addressed to Badgett and LeRoux, indicated that some negotiations had taken place and set a price of $1,000,000 for each BRS limited partnership interest and $5,000,000 for LeRoux's general partnership interest. The letter added, however, that both of these prices were "subject to such adjustments for pro-rated and similar items as we may agree upon." The letter went on to note that Mugar needed "additional time and information to reach a final decision" whether to purchase those interests. The letter stated that "the purpose of this letter is to confirm that you have granted me *the exclusive right to negotiate with you* for the purchase of such interests . . . upon the following terms and conditions, *and if we reach agreement* as a result of such negotiations, *the exclusive right to purchase such interests*" (emphasis supplied). The letter detailed some terms and conditions that the parties had agreed upon and gave Mugar the exclusive right, through May 31, 1983, "to elect to purchase the entire limited partnership in the Red Sox" and NEA owned by Ball One and Strike One, as well as LeRoux's general partnership interest. This right, however, was expressly made "[s]ubject to our arriving at [the] definitive Purchase and Sale agreement described below which is mutually acceptable to you [LeRoux and Badgett] and to me [Mugar]." In consideration of what was described as the "Exclusive Right to Negotiate," Mugar stated, "I am paying you an aggregate Deposit of $100,000, which will be applied on account of the purchase price if the purchases and sales contemplated hereby are consummated." The deposit was to be returned upon the occurrence

of any one of a number of specified conditions, one of which required that all the terms of sale be "reasonably satisfactory" to Mugar. The letter concluded by stating an understanding that Badgett and LeRoux would not negotiate with anyone else during the agreed negotiation period and also asked for confidentiality, with certain exceptions, such as disclosure to the other general partners in order to obtain their consent to any sale. Both LeRoux and Badgett signed a counterpart of this letter under the legend "Confirmed and Agreed to." Mugar never paid the deposit required by the letter, nor were any subsequent agreements ever reached. The Mugar letter was shown to Sullivan and Harrington on May 6, 1983, during a meeting with Mugar at Fenway Park.

On May 10, 1983, JRY and Sullivan struck back by each sending a letter to LeRoux entitled "Acceptance of Offer to Purchase Edward G. LeRoux, Jr.'s General Partnership Interest". Both claimed that they had received notice (in the form of the Mugar letter) of LeRoux's "desire and attempt to sell or otherwise dispose of his entire interest as a General Partner in BRS and in New England Associates." These letters (which are identical) describe the Mugar letter as "a written option to purchase agreement", and claim that it made applicable their § 7.4(b) purchase rights. On May 20, 1983, LeRoux's attorneys delivered to JRY and Sullivan copies of a letter advising LeRoux that the Yawkey group's May 10 letters were of no effect.

The question whether the Mugar letter triggered rights conferred by § 7.4(b) requires measuring the effect of the letter against the imprecise words "attempts to sell" chosen by the parties as the foundation fact for a buy-out.[20]

---

[20] Disagreement exists over whether the operative words in § 7.4(b) giving rise to the buy-out rights are "desires to sell" or "attempts to sell." We think it plain that "attempts to sell" is the relevant language. This conclusion is supported by the fact that the original version of § 7.4(b) of the BRS agreement (see Appendix V) read as follows: "In the event any General Partner *desires to* retire, withdraw, transfer, assign, *sell*, exchange or otherwise dispose of . . . his General Partner interest" (emphasis supplied). The 1982 amendments to the BRS agreements, however, changed this language

The provision's history supplies some insight into its meaning. As previously noted, see note, 20, *supra*, the original version of § 7.4(b) of the BRS agreement called for buy-out if a general partner did anything which expressed a "desire[ ] to . . . sell" his general partnership interests. In 1982, however, the provision was amended, see note 20, *supra*, to insert an "or" at an important point and to add after the word "or" and before the verb "sell" the words "attempts to." These changes significantly altered the meaning of the provision and furnish some indication that the parties, by adopting the changes, wished to impose a higher threshold on the exercise of compelled buy-out rights. By the changes, we think the general partners granted each other reasonable latitude to ascertain, through contact and negotiation with prospective purchasers, the fair market value of a general partnership interest. The revised provision would also appear to contemplate enough negotiations between the partner who is thinking of selling and any prospective purchaser to reach some definitive statement of terms. That statement would allow the remaining general partners to decide intelligently whether they desired either (a) to allow the sale to be consummated and to accept the purchaser as a new general partner under the assignment and transfer provisions of § 7.4(a),[21] or (b) to exercise their buy-out rights. In either alternative, it would be important to all parties to establish the fair market value of a general partnership interest.

to read as follows: "[I]n the event any General Partner *desires to retire*, withdraw*s*, *or attempts to* transfer, assign, *sell*, exchange or otherwise dispose of . . . his General Partner interest" (emphasis supplied). It is obvious that the phrase "desires to" in the amended passage refers only to the word "retire," whereas the words "attempts to" refer to the string of verbs following them, including the word "sell." In this respect, the BRS agreement had undergone material revision. The NEA agreement also maintains an "attempts to sell" standard.

[21] Section 7.4(a) requires that any new general partner brought into the partnership by the transfer of an existing general partner's interest undergo an arduous qualification process. Although § 7.4(a) and § 7.4(b) serve different purposes, we view § 7.4(a) as contemplating a set of facts clear enough to permit the remaining general partners to pass intelligently on admission of the new general partner. In this respect, § 7.4(a) sheds light on the meaning of the "attempts to sell" language in § 7.4(b).

As we have said in a slightly different context "Until the documents are signed and delivered the game is not over. Businessmen would be undesirably inhibited in their dealings if expressions of intent and the exchange of drafts were taken as legally binding agreements." *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 632 (1979).

The Mugar letter, in our view, did not go beyond the stage of testing the waters. The letter clearly does not create a binding purchase and sale agreement since several important terms are left to future agreement. Before an enforceable agreement arises "[a]ll [its] essential terms . . . must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined." *Cygan* v. *Megathlin*, 326 Mass. 732, 733-734 (1951), and cases cited. For the same reasons, the letter does not satisfy the requirements for a binding option to purchase. See *Lucey* v. *Hero Intl. Corp.*, 361 Mass. 569, 574 (1972). For example, the letter failed to specify the time and manner of payment, made the purchase price "subject to such adjustment for pro-rated and similar items as we may agree upon," without identifying the items subject to adjustment, and required all the terms to be "reasonably satisfactory" to Mugar. Nor does it manifest the attributes usually associated with a right of first refusal. Compare *Callaghan* v. *Hawkes*, 121 Mass. 298 (1876); *Seward* v. *Weeks*, 360 Mass. 410 (1971). Thus, we do not have a situation where "the terms of the agreement had been well rounded out and the formal agreement, as Mr. Justice Holmes so aptly characterized it, remained to be executed as a mere 'additional wheel in the machinery.' . . . In this case the machine was lacking some of its most vital parts." *Blair* v. *Cifrino*, 355 Mass. 706, 710 (1969), quoting from *Drummond* v. *Crane*, 159 Mass. 577, 579 (1893). The letter is what it purports to be, the grant by LeRoux and Badgett to Mugar, for a period of thirty days, of an "Exclusive Right to Negotiate" for the sale of LeRoux and Badgett's partnership interests. In so doing, the letter, and the acts leading up to it, did nothing more than place the parties in a state of "imperfect negotiation," *Rosenfield* v. *United States Trust Co.*,

290 Mass. 210, 217 (1935), and constituted "an initiatory step . . . not an act by which [the parties to it] meant [finally] to be bound." *Benton* v. *Springfield Y.M.C.A.*, 170 Mass. 534, 537 (1898).

There is some force in the argument that a final and enforceable purchase and sale agreement, definite option or right of first refusal may not be needed to bring into effect the buy-out provisions contained in § 7.4(b). The language under study may have been clumsily drafted or purposely left ambiguous in order to permit the parties some room to shop around. We conclude that the latter is the more likely, and that the tentative steps involving negotiation represented by the Mugar letter are insufficient to compel a forced sale of LeRoux's general partnership interests.[22] We need not venture any further to resolve the final issue in the case.

4. *Disposition.*

The judgment is a comprehensive and detailed four-page declaration of the rights of the parties. Our review necessitates that part VI of the judgment be vacated and that part VII be supplemented.[23] The judgment is modified by striking part VI

---

[22] The Yawkey group has made a considerable effort to define the word "attempt" in terms of the definition given to the concept of an attempt in the criminal law. The considerations which underlie the prevention of crimes and which formulate the requirements of criminal offenses, e.g., mens rea, intent, etc., seem to us inapposite to the considerations involved in contract interpretation. The civil cases relied on by the Yawkey group are also largely unhelpful since they involve contractual language different from that contained in § 7.4(b). See, e.g., *Chandler & Co.* v. *McDonald-Webster Co.*, 215 Mass. 365 (1913) ("decides to sell"); *Seward* v. *Weeks*, 360 Mass. 410 (1971) ("contemplated sale"); *Turner* v. *Shirk*, 49 Ill. App. 3d 764 (1977) ("desires to sell").

[23] In part VII(1) the judgment declares that the Mugar letter is "not an offer for purposes of establishing fair market value under Section 7.1(a) of the partnership agreements." In context this statement means that the Mugar letter did not trigger the rights given general partners by § 7.1(a) of the agreements to buy out the interests of limited partners who attempt to assign or transfer their interests. This language in the judgment is not to be taken as rendering the Mugar letter inadmissible in any appraisal or arbitration proceedings required by the agreements to establish the fair market value of partnership interests. We have no doubt that the letter would be admissible in such proceedings as evidence of value. See McCormick, Evidence §§ 348,

thereof and substituting the following: "VI. *As to the Plaintiffs' Second Counterclaim*: (1) The defendants Ball One, Strike One and Curran have interfered in the management of the BRS and NEA by their adoption of and their conduct in carrying out the Amendments; (2) The general partners, if they so desire, may effect, within a reasonable time, the involuntary withdrawal of Ball One, Strike One and Curran from BRS and NEA pursuant to § 8.3 of the partnership agreements, since those limited partners have engaged in proscribed interference in the management of the partnerships; (3) LeRoux is not to participate in the deliberations or vote on any resolution of the general partners to effect involuntary withdrawal; and (4) The plaintiffs' second counterclaim is otherwise dismissed." In addition there is to be added to part VII of the judgment the following: "VII(1)(A) The Mugar letter, however, shall be admitted as evidence of the fair market value of general and limited partnership interests in any appraisal or arbitration proceedings conducted pursuant to the various provisions of the agreements." As so modified and supplemented the judgment is affirmed. Each party is to bear his or its costs of appeal.

*So ordered.*

Appendix.

I.

JUNE 6, 1983, AMENDMENTS TO
THE BRS PARTNERSHIP AGREEMENT

"The Partnership Agreement is hereby amended in accordance with Section 5.8(b)(1) thereof as follows:

---

350 (2d ed. 1972); 1 Wigmore, Evidence §§ 4(c) and 4(e) (Tillers rev. 1983); Liacos, Handbook of Massachusetts Evidence 452-457 (5th ed. 1981). Such proceedings are likely under § 8.4 of the agreements.

The only other portion of the judgment which has not been discussed is part III thereof disposing of the LeRoux group's request for a declaration that neither the grant of the power to amend in § 5.8(b) nor the amendments proposed by the amending limited partners will result in the loss of any limited partner's limited liability. We agree with the reasons stated by the judge for declining to give such a declaration.

"1. Article I is hereby amended by adding the following defined term:

" *'Managing General Partner'* means Edward G. LeRoux, Jr. of 3026 Pinetree, Winter Haven, Florida 33880, or his successor as provided in Section 5.1(b)."

[There next follows a series of Amendments deleting the words "General Partners" wherever they appear in the agreement and substituting the words "Managing General Partner" (e.g. Edward G. LeRoux, Jr.) in their place. These substitutions had the effect of transferring the numerous substantial powers over control and management of the partnership's affairs from all the general partners to LeRoux as the new managing general partner.]

*Section 5.1 Management of Partnership Business*

"(a) Except as otherwise expressly provided herein, the Managing General Partner shall have the exclusive right to manage the business of the Partnership and is hereby authorized to take any action of any kind to do anything and everything it deems necessary or desirable in connection with the business of the Partnership. Except as otherwise expressly provided herein, no General Partner other than the Managing General Partner shall have any control over the business of the Partnership.

"(b) In the event of the death, dissolution or any other event resulting in the inability of the existing Managing General Partner to perform its duties hereunder, a new Managing General Partner may be selected from the remaining General Partners by a majority in interest of the Limited Partners. Any such new Managing General Partner shall succeed to and assume all rights, duties and obligations of the Managing General Partner as provided in this Agreement."

*Section 5.2 General Manager*

"(a) The Managing General Partner shall appoint a general manager (the "Manager") who will have the exclusive right to exercise the Managing General Partner's authority to manage the Partnership's business. Except as otherwise expressly provided herein, the Manager is hereby authorized to take any action of any kind and to do anything and everything it deems necessary or desirable to manage, conduct and operate the Partnership's business without the consent of the General Partners, and the General Partners shall not interfere with, or exercise any control over, the Manager, *provided, however,* that the General Partners may, by unanimous agreement only, (i) overrule any business decision made by the Manager or any action or inaction by the Manager as to any matter in connection with business of the Partnership and (ii) cause the Manager to make any business decision or to take any action in connection with the Partnership's business as may be specified by such unanimous agreement."

[There follows an extensive specification of the duties of the club's "manager" which involve control over all phases of the day-to-day operations of the club. For purposes of this appeal the June 6 amendments made identical changes in the NEA partnership.]

## II.

*Section 5.8 Rights and Obligations of the Limited Partners*

"(a) The Limited Partners shall take no part in, or interfere in any manner with, the control, conduct or operations of the Partnership and its business. The Limited Partners shall have no right or authority to act for or bind the Partnership.

"(b) The Limited Partners shall have the right, exercisable by written notice to the General Partners, by a vote of a majority in interest of the Limited Partners to:

(1) Amend the Agreement, subject, however, to the provisions of subsection (d) of this Section 5.8. The General Partners shall cause to be prepared an instrument amending this Agreement, which instrument shall contain the substance of the amendment made to this Agreement by the Limited Partners pursuant to the provisions of this Section 5.8(b)(1) and, if, required, to cause to be prepared and filed an amended Certificate reflecting the provisions of such amendment;

(2) Approve or disapprove of any sale (other than a sale or other disposition of any or all of the assets of the Partnership by any mortgagee, pledgee or secured party) of all or substantially all of the assets of the Partnership.

"(c) None of the rights described in subsection (b) of this Section 5.8 may be exercised until such time as the conditions set forth in both (1) and (2), below, have occurred:

(1) A judicial determination is obtained that neither the grant nor the exercise of such rights will result in the loss of any Limited Partners's limited liability, or counsel for the Partnership has delivered an opinion to the Partnership and to the Limited Partners to that effect; and

(2) That the grant or exercise of such rights will not adversely affect the tax status of the Partnership as a partnership for Federal income tax purposes and a favorable ruling to that effect has been obtained from the Internal Revenue Service, or counsel for the Partnership has delivered an opinion to the Partnership and to the Limited Partners to that effect.

"(d) The unanimous consent of the Limited Partners shall be required to amend the Agreement, if the effect of such amendment would be to increase the liability of the Limited Partners or to change (i) the Capital Contributions required of the Limited Partners, (ii) their right and interest in the Net Profits and Net Losses of the Partnership, or (iii) their rights upon dissolution and liquidation of the Partnership."

## III.

*Section 5.1 Authority of General Partners*

"Except as otherwise specifically provided . . . all decisions representing any matter set forth herein, or otherwise affecting or arising out of the con-

duct of the business of the Partnership, shall be made by a majority vote of the General Partners. The General Partners shall have the exclusive right and full authority to manage, conduct and operate the Partnership's business. Without limiting the foregoing, the General Partners shall be authorized: . . .

"(d) To employ such agents, employees, managers, accountants, attorneys, consultants and other persons necessary or appropriate to carry out the business of the Partnership and to pay such fees, salaries, wages, expenses and other compensation to such persons as they shall, in their sole discretion, determine."

## IV.

*Section 8.3 Involuntary Withdrawal of a Limited Partner*

"By unanimous consent, the General Partners may, in their discretion, effect the involuntary withdrawal of a Limited Partner from the Partnership upon the occurrence of any of the following events:

"(a) The unauthorized interference by such Limited Partner in the management of Partnership affairs

[Other grounds for involuntary withdrawal are omitted]."

## V.

*Section 7.4 Assignment of a General Partner's Interest*

*(Original version in the BRS Agreement)*

"(b) In the event any General Partner desires to retire, withdraw, transfer, assign, sell, exchange or otherwise dispose of all or any part of his General Partner interest in the Partnership, or in the event of the death of an individual General Partner, the applicable interest of such General Partner (the Transferring General Partner) shall automatically be deemed to be offered for purchase to the remaining General Partner(s), at their option, [for a price and upon terms thereafter designated]."

*Section 7.4 Assignment of a General Partner's Interest*

*(As Amended by Second Amendment to the BRS Agreement)*

"(b) In the event any General Partner desires to retire, withdraws, or attempts to transfer, assign, sell, exchange or otherwise dispose of all or any part of his General Partner interest in this Partnership or in the Boston Red Sox Baseball Club, or in the event of the death of an individual General Partner, the applicable interest of such General Partner (the Transferring General Partner) shall automatically be deemed to be offered for purchase to the remaining General Partner(s), at their option, [for a price and upon terms thereafter designated]."