COMMONWEALTH *vs.* PATRICK MCCROHAN.

No. 91-P-14.

Bristol. February 2, 1993. - March 29, 1993.

Present: BROWN, PORADA, & LAURENCE, JJ

*Assault and Battery on Certain Public Officers and Employees. Arrest.*
*Police,* Authority of police chief. *Municipal Corporations,* Police.

At the trial of a defendant charged with two counts of assault and battery
on a police officer "engaged in the performance of his duty," the evi-
dence warranted the jury in finding that two municipal police officers
were so engaged when acting outside their town's territorial boundaries
in response to an informal request, pursuant to a mutual aid agreement
under G. L. c. 40, § 8G, by the sole police officer on duty in a neighbor-
ing town [281-285], and the jury were accurately instructed with re-
gard to this factual issue [285-286].

COMPLAINT received and sworn to in the Taunton Division
of the District Court Department on February 22, 1989.

On appeal to the jury session of the Fall River Division,
the case was tried before *Robert L. Anderson,* J.

*Robert A. Costantino* for the defendant.

*Elspeth P. Cypher,* Assistant District Attorney, for the
Commonwealth.

LAURENCE, J. On the morning of January 8, 1989, Patrick
McCrohan became engaged in a violent physical struggle
with two Freetown police officers outside his home in Berk-
ley. Four days later, one of the officers obtained a criminal
complaint against McCrohan, charging him with two counts
of assault and battery on a police officer under G. L. c. 265,
§ 13D.[1] On April 23, 1990, a six-person jury found McCro-
han guilty as charged.

---

[1]At the time of the complaint, G. L. c. 265, § 13D, as amended through
St. 1988, c. 285, provided, in pertinent part:

McCrohan's appeal attacks as error the judge's denial of his pretrial motion for dismissal and his motion for a required finding of not guilty at the conclusion of the Commonwealth's case. Both motions asserted that, since the Freetown officers were outside their jurisdiction at the time of the fracas, they were not "police officers" under the statute but mere civilians. He also assigns as errors the judge's instructions to the jury on the jurisdictional issue and several related matters. We affirm McCrohan's convictions.

*The evidence.* On January 8, 1989, Officer Frederick Bopp was the only police officer on duty in the town of Berkley, which, he later testified, made him the commanding officer of the shift. At approximately 10:30 A.M., while patrolling in a marked police cruiser, he observed Clarence Newman speeding down Bayview Road in a vehicle with an expired inspection sticker. Bopp began to pursue Newman with his overhead blue lights flashing. Newman continued half a mile further, then drove into McCrohan's driveway and ran into McCrohan's house, requesting (according to McCrohan) to use the bathroom. Bopp pulled up behind Newman's car and knocked at the door. McCrohan answered and, in response to Bopp's request to see the driver of the car, asked Bopp, "Would you believe that I was driving that vehicle?" After Bopp revealed that he had seen the driver, McCrohan went inside and produced Newman, who had locked himself in McCrohan's bathroom.

Newman provided Bopp with the registration papers for the vehicle (which belonged to his girlfriend) but explained that he had forgotten to bring his license, which he claimed had recently been reinstated after a suspension. When Bopp

"Whoever commits an assault and battery upon a police officer [or any of twenty-two other specified public officials] . . . when such person is engaged in the performance of his duty at the time of such assault and battery . . . shall be punished by imprisonment for not less than ninety days nor more than two and one-half years in a house of correction or by a fine of not less than five hundred nor more than five thousand dollars."

In 1990, the statute was broadened to apply to "an assault and battery upon any public employee when such person is engaged in the performance of his duties at the time of such assault and battery." St. 1990, c. 498.

radioed from his cruiser to check on the status of Newman's license, his dispatcher informed him that their computer was down. Monitoring these transmissions, as was customary among police in the area, were Freetown police officers Carlton Abbott and Steven Abbott, who were in uniform and on duty in their police cruiser in neighboring Freetown, which lies south of Berkley. Carlton Abbott was at the time the commanding officer in charge of that particular Freetown shift. The Abbotts radioed Bopp that the Berkley dispatcher could obtain the license information from the Freetown station. Bopp passed this along to his dispatcher, who shortly thereafter informed Bopp that Newman's license had been suspended but that the information was not current enough to support an arrest for operating after suspension.

Newman and McCrohan had meanwhile gone to McCrohan's back yard, supposedly to inspect an old jeep McCrohan was offering for sale. After making preparations to jump-start the jeep with cables attached to his own car, McCrohan went back into his house to find the keys to the jeep. At that juncture, the two Freetown officers arrived on the scene, just as Bopp was finishing his conversation with his dispatcher. Bopp apprised them of the situation and expressly asked them to accompany him in questioning Newman and McCrohan. They proceeded into McCrohan's back yard, just as McCrohan returned to the jeep with the keys. Newman was nowhere in sight. The three officers approached McCrohan, and Bopp asked him where Newman was. McCrohan said he did not know. Bopp then asked if McCrohan had helped Newman flee by advising him of the way through the woods that adjoined McCrohan's yard, which McCrohan vehemently denied.

Trial testimony as to what happened next conflicted. According to McCrohan, Carlton Abbott stepped up to him "face to face" and profanely demanded that he identify himself. McCrohan replied that he was the owner of the property, demanded that they leave, stated that he was going back into his house, and started walking toward the house in a direction that would require him to pass between Carlton

Abbott and Steven Abbott. In response, the Freetown officers stepped together as if to block his path, but McCrohan kept walking and "all three of [their] shoulders hit." McCrohan was then grabbed by the hair, thrown to the ground, and kicked or hit in the ribs and head until his wife and father, who had been watching from inside the house, ran out shouting, "What's going on here?" At that point, he was walked to the Freetown police cruiser and placed inside. The testimony of McCrohan's wife and father generally corroborated his claim of being the victim of police aggression.

The three officers uniformly testified that McCrohan had initiated the physical contact by shoving both Abbotts in the chest as he attempted to push by them. Steven Abbott then grabbed McCrohan by the back of his collar and, with McCrohan thrashing his elbows wildly, they both fell to the ground. Carlton Abbott "jumped on top" to assist in handcuffing McCrohan, who was still violently resisting, while Bopp held off McCrohan's two dogs who had rushed, growling, barking, and snapping their jaws, toward the commotion. After handcuffing McCrohan on the ground, the Abbotts placed him in the Freetown cruiser but transferred him to the Berkley cruiser when Bopp pointed out that it was his jurisdiction and he was the officer in charge. The Freetown officers then left in their cruiser, and Bopp soon thereafter released McCrohan because he "seemed remorseful" and offered to cooperate with Bopp in "the Newman case."

McCrohan was treated at a hospital that day for a mild concussion, after which he stopped at the home of the Berkley chief of police to describe what had occurred. The following day, he telephoned a local attorney's radio talk show and on the air discussed the turbulent incident, inquiring about the possibility of a civil suit against the police. Three days later (four days after the incident) Carlton Abbott applied for the criminal complaint.[2] McCrohan was found guilty on

---

[2]Despite McCrohan's insinuation that the criminal complaint was filed to intimidate or retaliate against him on account of his potential civil suit (which he in fact later commenced in Federal District Court), the sole evidence on the subject of the timing of the complaint was Carlton Ab-

both counts at a bench trial in Taunton District Court on September 21, 1989, and subsequently exercised his right to a trial de novo in the Fall River District Court jury session.

*McCrohan's motions for dismissal and required findings.* McCrohan's motion to dismiss essentially argued that the evidence was insufficient to establish that the Freetown officers were engaged in the performance of their duties at the time of the alleged offense. It was properly denied because the judge at the jury trial "ha[d] no choice but to deny a motion to dismiss which is based on an alleged insufficiency of the evidence at a previous bench trial." *Commonwealth* v. *Vaughn*, 18 Mass. App. Ct. 262, 263 (1984).

The underlying theme of McCrohan's motion for required findings and his principal appellate argument is that the Freetown officers lacked authority to act outside of Freetown and therefore were not "police officers . . . engaged in the performance of [their] dut[ies]" at the time of their confrontation. Thus, he claims, an essential element of the offense charged under G. L. c. 265, § 13D, could not legally be established. The Commonwealth acknowledges that a police officer's authority is limited to the territorial boundaries of the governmental unit which appoints him, barring a statutory exception, see *Commonwealth* v. *LeBlanc*, 407 Mass. 70, 73 (1990); that the most commonly cited statutory exception is not here applicable[3]; and that, in the absence of a statutory exception, "[w]hen a police officer makes a warrantless arrest outside of his jurisdiction . . . he acts as a private citizen . . . ." *Commonwealth* v. *Grise*, 398 Mass. 247, 250 (1986). See *Commonwealth* v. *Owens*, 414 Mass. 595, 599 (1993).

The Commonwealth maintains, however, that McCrohan's reiterated citation of *Grise* and similar cases involving warrantless police arrests and his emphasis on the absence of circumstances justifying application of the fresh pursuit princi-

---

bott's testimony that he filed charges only after it had become clear that the Berkley authorities were not going to pursue the matter.

[3]That exception is provided by G. L. c. 41, § 98A, as inserted by St. 1967, c. 263, which authorizes arrest by a police officer outside of his city or town "on fresh and continued pursuit." See also note 8, *infra*.

ple of G. L. c. 41, § 98A, are irrelevant. We agree. The issue here was not the power of the Freetown officers to arrest Mc-Crohan but whether they were "engaged in the performance of [their] dut[ies]" at the time of the melee with McCrohan which the jury found involved an assault and battery upon them by McCrohan.[4] The Commonwealth relies on an existing mutual aid agreement between Berkley and Freetown, entered into pursuant to G. L. c. 40, § 8G,[5] and on evidence demonstrating that the agreement was invoked in the instant circumstances, as providing the basis for the Freetown police officers' lawful presence in Berkley. We find the Commonwealth's reliance justified.

Examining the evidence in the light most favorable to the Commonwealth, as we must, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979); *Commonwealth* v. *Sabetti*, 411 Mass. 770, 777 (1992), we conclude that it was more than sufficient to permit the jury to find that the mutual aid agreement was in effect and had been properly implemented in the McCrohan brawl, thereby investing the Freetown officers with the powers of Berkley police officers.[6] The Commonwealth presented uncontested testimony that

---

[4]Even if the uniformed Freetown officers had been unlawfully attempting to arrest McCrohan at the time, he could nonetheless have been found guilty under G. L. c. 265, § 13D, because he had no right to resist an unlawful arrest that was being accomplished without excessive force (which McCrohan does not here allege). See *Commonwealth* v. *Moreira*, 388 Mass. 596, 600-601 (1983). The judge properly instructed the jury on this point.

[5]General Laws c. 40, § 8G, as inserted by St. 1972, c. 220, § 2, empowers a city or town to enter into an agreement with one or more other cities or towns "to provide mutual aid programs for [their] police departments to increase the capability of such departments to protect the lives, safety, and property of the people in the area designated in the agreement. Said agreement may include the furnishing of personal services, supplies, materials, contractual services, and equipment when the resources normally available to any municipality in the agreement are not sufficient to cope with a situation which requires police action."

[6]The Berkley-Freetown mutual aid agreement, to which the towns of Dighton, Raynham, and Lakeville and the city of Taunton were also signatories, provided in § 5.0 that "[p]olice officers from a sending community shall have all the powers of police officers, including the power of arrest, while responding to a mutual aid request."

Bopp was the commanding officer of the Berkley police force on the morning in question; that he had made an explicit request to the Freetown officers to assist him in questioning Newman and McCrohan; and that the request was received and favorably responded to by the then-commanding officer of the Freetown police, Carlton Abbott. The judge below therefore correctly denied McCrohan's motion for a required finding of not guilty.[7]

---

[7]The pertinent provisions of the mutual aid agreement were the following:

"SECTION 2.0 *SITUATIONS COVERED*

The provisions of this agreement may be invoked for any situation occurring within the boundaries of a signatory community which situation requires the use of resources not immediately available to the local law enforcement agency.

"SECTION 3.0 *METHOD OF REQUESTING ASSISTANCE*

The Chief of Police or, in his absence, the Commanding Officer shall determine when the assistance of other law enforcement agencies is required, and shall notify the person designated to receive such request in the appropriate signatory community.

"SECTION 3.1

Each signatory community shall designate one or more persons to receive requests for law enforcement mutual aid. Each signatory community will be kept informed of the names and phone numbers at which such designated persons can be contacted. Each community shall assure that twenty-four hour a day phone coverage is provided.

"SECTION 3.2

The Chief of Police or, in his absence, the Commanding Officer shall determine whether and to what extent a request received under this agreement will be fulfilled. In the event that a Chief or, in his absence, the Commanding Officer determines that no assistance, or assistance differing from that requested, will be provided, he will so notify the requesting department of his determination as quickly as possible.

"SECTION 4.0 *COMMAND AND CONTROL*

Law enforcement personnel and equipment, upon entering the jurisdiction of a receiving department in response to a request for mutual aid, shall be under the direction and control of the Commanding Officer of the receiving department. So far as practicable, officers from a sending department will be utilized in conjunction with officers from a receiving department so as to compensate for the lack of knowledge of the geography of the receiving community."

McCrohan's arguments that the mutual aid agreement was inapplicable to his case are based upon a strained and unpersuasive interpretation of that document. He contends that the agreement establishes as a precondition that a formal request be made by the proper officer in one community to a predesignated person in the other community which must be received, processed, and responded to prior to the dispatch of any personnel or resources from the receiving to the requesting community. That reading finds no support in the agreement. It contains no requirement that a request be made in any specific manner or while the respective officers are in any particular location. See note 7, *supra.*

The police chiefs of both municipalities testified that the agreement can be and had been implemented by ad hoc arrangements that fall short of formal prior requests. One of the acceptable methods of invoking the agreement to which the Berkley chief testified was the very case at hand — a request for assistance by an officer of one town to an officer from another signatory town who happened to be passing through. The way parties have in fact performed their agreements is one of the best guides to proper construction. See *Martino* v. *First Natl. Bank*, 361 Mass. 325, 332 (1972). Given the Lilliputian character of the Berkley and Freetown police departments, as well as the frequently fleeting and emergency nature of many situations that confront police officers, even in bucolic communities, it is both reasonable and commonsensical to construe the mutual aid agreement so as to accommodate such informality and flexibility. See *Stop & Shop, Inc.* v. *Ganem*, 347 Mass. 697, 701 (1964); *JRY Corp.* v. *LeRoux*, 18 Mass. App. Ct. 153, 159-160 (1984).[8]

---

[8]Although we need not decide the question, given the mutual aid agreement, the exchange between Bopp and Carlton Abbott, both acting as commanding officers of their respective forces, also appears to have satisfied the requirements of G. L. c. 41, § 99, which provides for the requisition of police officers by other jurisdictions. Section 99, as amended through St. 1965, c. 382, states:

"The mayor, selectmen, chief of police, or person however designated having the duties of a chief of police, or, in the absence of the chief of police, or person however designated having the duties of a chief of police,

Commonwealth *v.* McCrohan.

McCrohan's other objection to the applicability of the mutual aid agreement is even wider of the mark. He asserts, nakedly, that the "minor civil motor vehicle infraction committed by Newman" could not rise to the level of need that would require the assistance of a police officer from a signatory community under the agreement. He provides, however, no authority for the proposition implicit in his assertion, that this or any court is empowered to second-guess and invalidate a police officer's discretionary determination that an ongoing field investigation requires additional resources beyond a single officer's capabilities. This is unacceptable appellate argument that we need not consider. See *Graham* v. *Quincy Food Serv. Employees Assn. & Hosp., Library & Pub. Employees Union,* 407 Mass. 601, 605 n.2 (1990); *Foley* v. *Evans,* 30 Mass. App. Ct. 509, 512-513 n.5 (1991).[9]

---

*the commanding officer, may upon the request of* the mayor, selectmen, chief of police, or person however designated having the duties of a chief of police, or in the absence of the chief of police or person however designated having the duties of a chief of police, *the commanding officer of any other city or town, provide police officers, who shall have the authority of constables and police officers within the limits of such city or town,* except as to the service of civil process, and, *while exercising such authority within such limits, shall have the same immunities and privileges as when acting within their respective cities and towns*; and the city or town providing said officers shall be entitled to receive from such city or town the amount paid to them for their service, including their necessary traveling expenses" (emphasis supplied).

Our appellate courts have frequently observed that to validate extraterritorial arrests, police departments should have their officers sworn in as special officers on the police forces of neighboring cities and towns under § 99. See *Commonwealth* v. *Grise,* 398 Mass. at 252-253 n.6; *Commonwealth* v. *LeBlanc,* 407 Mass. at 73; *Commonwealth* v. *Dise,* 31 Mass. App. Ct. 701, 704 n.6 (1991).

[9]McCrohan's assertion is particularly insubstantial in light of the fact that the challenged determination was made by Bopp as commanding officer of the Berkley police department, the very person whom the agreement empowers to "determine when the assistance of other law enforcement agencies is required." See note 7, *supra.* Furthermore, McCrohan's apparent friendship with and willingness to help Newman warranted Bopp's cautious decision to request the assistance of the Abbotts in a "situation [that] require[d] the use of resources not immediately available to" Bopp as the sole policeman on duty in Berkley. See *ibid.*

*The jury instructions.* McCrohan's main claim of error in the charge arises from the judge's refusal to instruct the jury that G. L. c. 41, § 98A, limited the arresting authority of the Freetown police officers to their territorial jurisdiction and that, in the absence of proof of fresh pursuit, they were acting solely as private citizens on McCrohan's premises in Berkley. The judge did not err, however, since, as noted above, the Freetown officers' power to arrest McCrohan was not a legitimate issue in the case.

The question to be decided was whether the Freetown officers were, in the circumstances, "engaged in the performance of [their] dut[ies] at the time of" the scuffle, which preceded any arrest. McCrohan's requested instruction would have improperly removed that question from the jury, transforming a factual issue into an erroneous conclusive legal determination on this record. The judge accurately charged as to the elements of assault and battery and the Commonwealth's burden to convince the jury beyond a reasonable doubt that the Freetown officers were, at the moment of the tumult, engaged in the performance of their duties pursuant to the provisions of the mutual aid agreement. The instructions correctly left the essential factual questions underlying proof of the elements of the offense charged for the jury to resolve.

McCrohan's other challenges to the judge's charge lack merit for the reasons set forth in the brief of the Commonwealth.

*Judgments affirmed.*