## Commonwealth *vs.* Jason Twombly.

No. 99-P-1307.

Essex. October 16, 2000. - January 5, 2001.

Present: Brown, Smith, & Lenk, JJ.

Further appellate review granted. 434 Mass. 1101 (2001).

*Motor Vehicle,* Operating under the influence. *Alcoholic Liquors,* Motor vehicle. *Police,* Unlawful arrest. *Arrest.*

A police officer did not have a reasonable belief that the person operating a motor vehicle was committing a crime [668-669], nor did the operator's conduct in speeding and passing improperly amount to a breach of the peace [669-671], such as would authorize the officer to make a lawful warrantless arrest of the operator pursuant to G. L. c. 37, § 13, beyond the officer's territorial jurisdiction.

Complaint received and sworn to in the Newburyport Divisionof the District Court Department on September 28, 1998.

A pretrial motion to suppress evidence was heard by *Allen G. Swan,* J., and the case was heard by *Leah W. Sprague,* J.

*Wimberley Burton* for the defendant.

*Gregory I. Massing,* Assistant District Attorney, for the Commonwealth.

Lenk, J. Following a jury-waived trial, the defendant appeals from his conviction of operating a vehicle under the influence of intoxicating liquor.[1] He claims on appeal that it was error for the judge to have denied his motion to suppress all evidence obtained as the result of an improper extraterritorial stop of the defendant in Salisbury by an Amesbury police officer.[2]

We summarize certain salient facts found by the motion judge. From his vantage point on Route 110 in Amesbury at about 8:30 p.m. on September 27, 1998, Amesbury police Sergeant

---

[1]He was found not responsible for cited speeding and passing violations.

[2]He also asserts error in the trial judge's denial of his motion in limine to exclude evidence as a result of that stop. We need not reach this issue in view of our disposition of the suppression motion.

Scholtz saw the defendant speed down the exit ramp from Route 495 onto Route 110 and stop at a red light. As Scholtz followed with two cars separating his cruiser from the defendant's vehicle, he saw the defendant speed off again after the light changed and continue at a high rate of speed into Salisbury. Traffic was moderate and Scholtz tried without success while in Amesbury to clock the defendant's speed, which he estimated as fifty to fifty-five miles per hour in twenty-five to thirty-five miles per hour zones. Scholtz followed the defendant into neighboring Salisbury, where he saw the defendant pass another car uneventfully, but illegally, in a no passing zone. Scholtz contacted the Salisbury police, telling the dispatcher that the defendant "was traveling at a high rate of speed and just passed another vehicle on Elm Street," and asking whether there was a cruiser in the area. Salisbury police Sergeant Sforza overheard the transmission on his radio and told the dispatcher to tell Scholtz that he should make the stop. Scholtz activated his lights for the first time and pulled the defendant over, telling him that he was from Amesbury, that a Salisbury officer would soon be by and that he had stopped the defendant for speeding and improper passing. Sforza arrived moments later, and noticed the defendant's face was red, his eyes bloodshot, and his breath smelled of alcohol. The defendant performed field sobriety tests, was arrested for operating under the influence of liquor, and was cited for speeding and improper passing. He was not charged with operating to endanger.

*Discussion.* A police officer's authority to act is limited to his or her jurisdiction, unless specifically authorized by statute or if performing a valid citizen's arrest at common law. *Commonwealth* v. *Savage*, 430 Mass. 341, 343-346 (1999). It is the Commonwealth's burden to demonstrate the lawfulness of a warrantless, extraterritorial stop by a police officer. See *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974). The Commonwealth contends on appeal[3] that the challenged extraterritorial stop in Salisbury by Amesbury police was lawful because

---

[3]The Commonwealth also asserted at the suppression hearing that the stop was authorized by virtue of a mutual aid agreement between Salisbury and Amesbury under G. L. c. 40, § 8G. See *Commonwealth* v. *McCrohan*, 34 Mass. App. Ct. 277, 282-283 & n.5 (1993). The motion judge found that such an agreement was in effect and, on that basis, concluded that the Amesbury officer was authorized to make the extraterritorial stop of the defendant. While the record may support the judge's finding that an agreement of this nature was in effect, it is silent as to the relevant terms of that agreement, particularly

the stop was authorized under G. L. c. 37, § 13, authorizing an officer to request aid. *Commonwealth* v. *Morrissey*, 422 Mass. 1, 6 (1996). That statute authorizes officers to seek "aid in the execution of their office in a criminal case, in the preservation of the peace, [or] in the apprehending or securing of a person for a breach of the peace."

In *Morrissey*, a Sterling police officer, driving outside his jurisdiction in West Boylston, observed "a Buick automobile run a stop sign then veer to the right of the road and narrowly miss a telephone pole. The car quickly corrected, crossed the double solid line separating north and south bound traffic, then corrected again and, swerving back to the extreme right, nearly hitting the guard rail." *Id.* at 2-3. After hearing a report of the defendant's wild driving, a West Boylston officer requested the Sterling officer to stop the defendant. Having heard the report of the defendant's driving, the West Boylston officer "had reason to believe that the *crime* of operating a motor vehicle while under the influence of intoxicating liquor was being committed in [his] territorial jurisdiction" (emphasis added). *Id.* at 5. The officer's reasonable belief that the defendant was committing a crime placed the circumstances within the purview of G. L. c. 37, § 13, and the extraterritorial stop was accordingly lawful. *Id.* at 4, quoting from *Commonwealth* v. *Field*, 13 Mass. 321, 322, 324 (1816). See *Byrd* v. *Commonwealth*, 158 Va. 897, 902 (1932); Restatement (Second) of Torts § 139 (1965).

There is, however, a critical distinction between the instant circumstances presented and those in *Morrissey*. Here, the Salisbury officer who heard the Amesbury officer's report of the defendant's speeding and passing would find no basis in that report on which to form a belief that the defendant was committing a crime. Indeed, both the Salisbury and Amesbury officers testified that they believed only that the defendant was committing the *civil* traffic infractions of speeding and improper passing. Because the Salisbury police did not seek aid in a criminal case, the extraterritorial stop is not authorized in this respect by G. L. c. 37, § 13.

The Commonwealth contends, however, that, while not

---

as to what the agreement requires from personnel of one town in order to authorize action by the other. The only evidence in this regard (testimony from the officers of the respective municipalities) suggests that, in the present case, the agreement had not been implemented in accordance with its terms. The Commonwealth does not press this argument on appeal.

criminal, the defendant's conduct nevertheless constituted a breach of the peace, and the Salisbury police were accordingly authorized by the statute to seek the aid of the Amesbury police to apprehend or secure the defendant for his breach. The Commonwealth relies in this regard upon *Commonwealth* v. *Gorman*, 288 Mass. 294, 297-298 (1934), for the proposition that driving under the influence always constitutes a breach of the peace. In *Gorman*, however, the issue was whether arrest without a warrant was authorized to prevent an imminent breach of the peace the officer thought likely to occur because the defendant was driving under the influence. While *Gorman* does not suggest that a breach of the peace is somehow inherent in the act of driving under the influence, even if we were to accept this proposition for the sake of argument, neither the Salisbury nor the Amesbury officer had reason to believe, and did not believe, at the time the stop was requested that the defendant was driving under the influence. It follows, then, that the officers also could not have believed the defendant was committing a breach of the peace or that they were acting to prevent an imminent breach of the peace. The Commonwealth's position could only succeed were we to determine the lawfulness of a stop with the benefit of evidence obtained after and derived from the stop — here, that the defendant also displayed indicia of intoxication. The lawfulness of a stop, of course, cannot hinge on evidence obtained as a result of that stop lest the right guaranteed under the Fourth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights to be free from illegal searches and seizures be rendered meaningless.

We turn then to the possibility that, even apart from any necessary connection between driving under the influence and a breach of the peace, the defendant's conduct, viz., speeding and improper passing, might itself constitute a breach of the peace. *Commonwealth* v. *Orlando*, 371 Mass. 732 (1977), suggests the relevant criteria. First, the conduct must be of a character that most people would find to be unreasonably disruptive. *Id.* at 734-735. Second, the conduct must in fact have infringed on someone's right to be undisturbed. Whether conduct disturbs the peace will depend on when and where it occurs, for what may be perfectly appropriate conduct at one time and place may at another be a breach of the peace. *Id.* at 735. ("[L]ike a pig in the parlor instead of the barnyard," citing *Euclid* v. *Ambler*

*Realty Co.*, 272 U.S. 365, 388 [1926] [nuisance case]). The evidence the Salisbury officer could reasonably have believed, i.e., the defendant's conduct of speeding and passing, as he described it, does not constitute a breach of the peace.

We think that *Commonwealth* v. *LeBlanc*, 407 Mass. 70 (1990), rather than *Commonwealth* v. *Morrissey*, 422 Mass. 1 (1996), controls the result here. In *LeBlanc*, a Natick police officer while in Natick observed a vehicle pass through a red light at a high rate of speed. The officer followed the driver into Framingham where he stopped him. After the officer detected a strong odor of alcohol, he asked the driver to perform field sobriety tests, and then arrested him. Because the officer was not within his jurisdiction at the time of the arrest, and there was no statutory or common law exception to authorize the stop, it was held to be illegal. In so holding, the court rejected the Commonwealth's suggestion that expansion of the officer's territorial authority to make such stops was implied under G. L. c. 41, § 95 (extraterritorial authority to execute arrest warrants); G. L. c. 41, § 98 (extraterritorial authority to carry weapons); or G. L. c. 41, § 98A (extraterritorial fresh pursuit for arrestable offenses). The court observed that

> "Rather than implying that the Legislature intended to give the police the authority to make extraterritorial stops, these statutes demonstrate that the Legislature knows how to expand the extraterritorial authority of the police when it thinks it fit to do so. The Legislature has chosen not to provide the police with extraterritorial authority to make stops for traffic violations. If it wishes to modify that judgment, it may do so."

*Id.* at 75. In the present case, as in *LeBlanc*, the Commonwealth points to no statutory or common law authority that might legitimate the challenged warrantless extraterritorial stop. The motion to suppress should have been allowed.

The judgment is vacated, the finding is set aside, and an order shall enter allowing the motion to suppress.

*So ordered.*