**DEN NORSKE BANK AS, Plaintiff,**

v.

**The FIRST NATIONAL BANK OF BOS-TON, N.A. and BancBoston Real Estate Capital Corporation, Defendants.**

Civ. A. No. 92–11294 GN.

United States District Court,
D. Massachusetts.

Nov. 17, 1993.

20

John P. Zavez and Laura Steinberg, Sullivan & Worcester, Boston, MA, for plaintiff.

Joseph L. Kociubes and Stephanie A. Kelly, Bingham, Dana & Gould, Boston, MA, for defendants.

GORTON, District Judge.

Report and recommendation accepted and adopted.

***REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 5); PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRY # 12)***

November 3, 1993

BOWLER, United States Magistrate Judge.

On November 2, 1992, defendants First National Bank of Boston, N.A. ("FNBB")

and BancBoston Real Estate Capital Corporation ("BancBoston") (collectively: "defendants") filed a motion for summary judgment seeking summary judgment on all three counts contained in the complaint. (Docket Entry # 5). On December 30, 1992, plaintiff Den Norske Bank AS ("DnB") filed an opposition and a motion for partial summary judgment with respect to Count I of the complaint.[1] (Docket Entry # 12).

On September 29, 1993, this court held a hearing and took Defendants' Motion for Summary Judgment (Docket Entry # 5) and DnB's motion for partial summary judgment (Docket Entry # 12) under advisement.

## BACKGROUND

DnB filed this action on May 22, 1992, against defendants on the following three counts: (1) breach of contract (Count I); (2) breach of fiduciary duty (Count II) and (3) violation of Massachusetts General Laws chapter 93A ("chapter 93A") (Count III). (Docket Entry # 1). The instant litigation arises out of defendants' alleged breach of a participation agreement dated April 11, 1986. Under the participation agreement, DnB acquired a 17.34% interest in a loan given by BancBoston to Glades Road Association ("Glades"), a Florida partnership, in connection with Glades' construction of an office building in Boca Raton, Florida. (Docket Entry # 1).

The subsequent decline in the Florida real estate market resulted in a restructuring of the loan in September 1991 despite DnB's objection. DnB complains that defendants acted in disregard of DnB's express rights under the participation agreement. In addition, by failing to adequately examine various alternatives in lieu of restructuring the loan, defendants allegedly breached their fiduciary duty owed to DnB. (Docket Entry # 1).

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 5)

For purposes of summary judgment, this court finds the following facts.[2] In 1985 BancBoston and Glades entered into an agreement evidenced by various loan documents under which BancBoston loaned an estimated $55,256,000[3] to Glades ("Glades loan") for the construction of an office building in Boca Raton ("the project"). The nonrecourse loan was secured by a first mortgage on the project's real estate, a security interest in all personal property, an assignment of leases and rents and a letter of credit issued by Canadian Imperial Bank. (Docket Entry # 1, ¶ 6; Docket Entry # 5, ¶¶ 1–2; Docket Entry # 13, ¶¶ 1–2).

On April 11, 1986, BancBoston and Glades entered into a participation agreement ("participation agreement"). Under the participation agreement, DnC America Banking Corporation ("DnC America")[4] acquired a 17.34% interest up in the Glades loan up to a maximum amount of $7,500,000. (Docket Entry # 1, ¶¶ 6–7; Docket Entry # 5, ¶ 3; Docket Entry # 13, ¶ 3). The essential or basic form of the participation agreement "was BancBoston's." (Docket Entry # 1, ¶ 8; Docket Entry # 5, ¶ 8).

Paragraph 11 is a key provision of the participation agreement for purposes of defendants' motion for summary judgment.[5] This paragraph is subdivided into three sections and reads as follows:

1. The district judge referred these motions for a report and recommendation to this court on July 27, 1993. (Docket Entry # 25). After the parties moved to continue a hearing set for August 31, 1993 (Docket Entry # 27), this court held a hearing on the motions on September 29, 1993.

2. The complaint in the instant case is unverified. Under Rule 56(c), Fed.R.Civ.P., an unverified complaint primarily shows "the nature of the cause of action ... and the opposing party can take advantage of any admissions in it." *Ratner v. Young*, 465 F.Supp. 386, 389 & n. 5 (D.V.I. 1979).

3. The original loan documents were amended to increase the original loan of $43,256,000 to $53,-256,000. (Docket Entry # 1, Ex. A; Docket Entry # 5, ¶ 1; Docket Entry # 13, ¶ 1).

4. DnB is a Norwegian banking corporation licensed to do business in the United States. DnB succeeded to certain interests of Den Norske Bank (U.S.), formerly known as DnC America. (Docket Entry # 1, ¶ 1; Docket Entry # 7, ¶ 1). On or about December 31, 1991, DnB acquired DnC America's rights and interests under the participation agreement. (Docket Entry # 16, ¶ 4).

5. David M. Schwartz ("Schwartz"), Vice President of Den Norske Bank AS, New York Branch, attests that at DnB's request the parties inserted

11. *Approval of Principal's Actions.* Principal agrees that it shall not without prior written agreement by all Participants: (1) reduce the amount of the Loan principal or interest payments; (2) reduce the Loan interest rate; (3) postpone for a period of more than 60 days any due date for payment of the Loan principal; (4) release or subordinate any of the collateral or waive any claim against any guarantor or person who may be secondarily liable who would have a material, adverse effect on the collection and enforcement of the Loan or the Loan Documents; (5) suspend the accrual of Loan interest.

In other matters concerning the routine administration of the loan, Principal agrees not to deviate from the Loan Documents unless the majority (dollars outstanding) of the lending institutions agree to the change provided Principal is in the majority. In all cases where a consensus cannot be reached on matters of administration that is acceptable to Principal, Principal agrees to adhere to the Loan Documents.

In all cases pertaining to default, Principal agrees to adhere to Paragraph 13.

(Docket Entry #1, Ex. A).

Paragraph 13 of the participation agreement expressly pertains to defaults. The first section reads as follows:

13. *Loan Default Procedures.* Principal and Participants agree that in the case of default, courses of action will be agreed to by a majority (dollars outstanding) of the lending institutions providing the Principal is in the majority. In cases where a consensus cannot be reached on matters pertaining to default that is acceptable to Principal, the Principal agrees to adhere to the Loan Documents for all appropriate remedies.

(Docket Entry #1, Ex. A).

On November 12, 1987, BancBoston transferred its interest in the loan documents to FNBB. (Docket Entry #5, ¶4; Docket Entry #8, Ex. B; Docket Entry #12, ¶3). Under the terms of the participation agreement, BancBoston and its successor FNBB were responsible for administering the loan.[6] (Docket Entry #1, Ex. A).

In 1989 and 1990 FNBB obtained appraisals of the project from Landauer Associates ("Landauer"). Landauer appraised the project in 1989 and 1990 respectively at $53,000,000 and $41,000,000. (Docket Entry #16, ¶13). By the beginning of 1991 the Florida real estate market was in decline. (Docket Entry #1, ¶11; Docket Entry #5, ¶6;

---

paragraph 11 into the participation agreement. In January 1991, Schwartz began supervising and managing DnB's real estate portfolio. Consequently, he lacks personal knowledge of the above averment. Nevertheless, Schwartz avers his familiarity with the pertinent loan files maintained at BancBoston and attaches an April 14, 1986 letter from a BancBoston real estate officer to Monte L. Marfilius, Vice President of DnC America. The letter refers to a highlighted copy of the participation agreement and simply states "enclosed is a highlighted copy of this agreement showing clearly the changes that were made; specifically, pages 1, 2 and 3." (Docket Entry #16, Ex. B). In light of Schwartz's lack of personal knowledge concerning the April 1986 negotiations and the fact that the letter fails to identify which party inserted the change, i.e., paragraph 11, there exists a genuine issue of material fact concerning which party (BancBoston or DnC America) inserted paragraph 11 into the participation agreement.

6. Paragraph ten of the participation agreement provides as follows:

10. *Administration and Collection.* The Loan Documents shall be held by Principal for the ratable benefit of itself and as trustee for each Participant (to the extent of its participation) without preference or priority and without recourse on Principal. *Principal shall administer the Loan* [emphasis added] as it customarily does for similar loans for its own account, provided, however, Principal shall not be liable to Participant for any action or failure to act or for any error of judgment, negligence, mistake or oversight of it or any of its agents, officers, employees or attorneys with respect to the Loan if Principal has acted in good faith and has not been guilty of willful misconduct or gross negligence. Without limitations upon the generality of the foregoing, Principal may consult with legal counsel and other advisors selected by it, and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel or advisor. Principal shall promptly account for and pay over to Participants their proportionate share of all collections determined according to their participation in the loan at the time of any such collection.

(Docket Entry #1, Ex. A).

Docket Entry # 16, ¶ 13). In February 1991 an entity referred to as Victor Capital Group appraised the project in a "valuation range of" $35,800,000 to $44,800,000. (Docket Entry # 17, Ex. 1). Internally, FNBB viewed the project as having an estimated value of $36,780,000 in the winter and spring of 1991. (Docket Entry # 16, ¶ 14; Docket Entry # 17, Ex. 2). A May 1991 Shared National Credits Subject to Criticism report classified $34,656,000 of the $55,256,000 loan as substandard. (Docket Entry # 16, Ex. C).

In a report dated July 30, 1991, appraising the project as of June 17, 1991, Matonis MacDermott & Company ("Matonis") estimated the project as having a fair market value of $24,700,000 based on an "as is" sale of the project within a 12 month period ("Matonis report"). DnB received a copy of this report. (Docket Entry # 5, ¶ 6; Docket Entry # 13, ¶ 6; Docket Entry # 8, ¶ 7 & Ex. C; Docket Entry # 16, ¶ 15 & Ex. C). The Matonis report did not analyze the estimated worth of the project in the event the parties opted to foreclose on the project and own and operate it thereafter for an undetermined number of years. (Docket Entry # 8, Ex. C; Docket Entry # 16, ¶ 15).

The project loans were due to be repaid at the end of 1991. (Docket Entry # 1, ¶ 11; Docket Entry # 4, ¶ 11). In early to mid 1991 defendants notified DnB that Glades was seeking either to extend the due date on the loans or to reduce the amount of indebtedness. (Docket Entry # 1, ¶ 11; Docket Entry # 4, ¶ 11).

Schwartz, on behalf of DnB, avers that throughout the spring and summer of 1991 FNBB discussed various refinancing proposals with Glades.[7] Schwartz attests that DnB was neither notified of nor included in these discussions. In fact, as evidenced by certain FNBB interoffice communications, Schwartz avers that defendants attempted to combine a restructuring of the $55,200,000 loan to Glades with a requirement that Claridge purchase two buildings acquired by a subsidiary of FNBB. (Docket Entry # 13, ¶ 12; Docket Entry # 17, Ex. 6 & 7). The communications

between FNBB and Glades concerning restructuring the Glades loan during the spring and summer of 1991 are disputed.

On July 1, 1991, Glades failed to make the monthly interest payment due to FNBB at that time. On or about July 12, 1991, FNBB notified Glades of its default and demanded payment of the outstanding interest within ten days. Glades failed to cure the default. (Docket Entry # 5, ¶ 8; Docket Entry # 13, ¶ 8). Glades' actions constituted a default under the terms of the loan documents. (Docket Entry # 1, ¶ 12; Docket Entry # 4, ¶ 12).

Thereafter, FNBB instituted mortgage foreclosure and other collection procedures as provided under the terms of the loan documents. Specifically, on or about July 26, 1991, FNBB accelerated the loan and gave notice to Glades that a total of $53,325,112.95 was immediately due and owing. FNBB then drew on a letter of credit and applied $18,086,388.24 in proceeds to the outstanding amount. DnB received its pro rata share of $1,491,240. Glades failed to pay the remaining $35,238,274. On or about August 16, 1991, FNBB commenced foreclosure proceedings and instituted judicial action to enforce the assignments of leases and rents. (Docket Entry # 5, ¶¶ 9 & 10; Docket Entry # 8, ¶¶ 11 & 12; Docket Entry # 12, ¶ 8; Docket Entry # 13, ¶¶ 9 & 10).

According to an internal report dated August 23, 1991, FNBB estimated the fair market value of the project at $21,700,000. The internal report appraised the project at a lower fair market value than the Matonis report because the internal report utilized a lower percentage figure to value the project's anticipated net operating income for the year 2002 and a higher percentage figure for discounting capitalized income and annual cash flow for the years 1992 to 2001. (Docket Entry # 8, Ex. C, p. 66; Docket Entry # 13, ¶ 11; Docket Entry # 15, ¶ 7; Docket Entry # 16, Ex. E, p. 66; Docket Entry # 17, Ex. 4). On or about August 27, 1991, FNBB sent a copy of the internal report to DnB. (Dock-

---

7. Schwartz lacks personal knowledge of these discussions. The documents, however, speak for themselves.

et Entry # 5, ¶ 11; Docket Entry # 8, ¶ 13; Docket Entry # 13, ¶ 11).

On or about September 3, 1991, Glades submitted a workout proposal to FNBB prepared by Glades' Canadian general partner, Claridge Properties, Limited ("Claridge"). FNBB forwarded the proposal to DnB. The Claridge proposal suggested that Glades pay off $8,000,000 of the outstanding indebtedness and restructure the remaining balance into two equal parts of $17,000,000 with the first part (referred to as Part A) due in five years at a reduced rate of interest and secured by a mortgage on the project. The proposal additionally recommended payment of the second part (referred to as Part B) "only if the [project] is sold by [Glades] ... for an amount ... which exceeds the aggregate of (i) $25,000,000 plus [certain expenses incurred to date] ... or if [Glades] refinance[s] the [project] by way of a non-recourse loan and the proceeds of the refinancing ... exceed the aggregate of such amounts." The proposal further suggested limiting FNBB and DnB's payment under Part B "to 30% of any overage remaining after equity reimbursement." (Docket Entry # 1, ¶¶ 13–14; Docket Entry # 5, ¶¶ 12–13; Docket Entry # 6, ¶ 22; Docket Entry # 17, Ex. 17).

DnB objected to the proposed workout. (Docket Entry # 1, ¶ 14; Docket Entry # 4, ¶ 14; Docket Entry # 5, ¶ 12; Docket Entry # 12, ¶ 10; Docket Entry # 16 ¶¶ 22 & 23). Schwartz suggested to Paul F. DiVito ("DiVito"), Vice President of BancBoston in charge of supervising the Glades loan, various modifications to the restructuring proposal. (Docket Entry # 8, ¶ 15; Docket Entry # 16, ¶¶ 23 & 25). DnB apparently believed the project was worth approximately $31,600,000. (Docket Entry # 5, ¶¶ 13–14; Docket Entry # 8, ¶ 15; Docket Entry # 13, ¶ 14). On or about September 13, 1991, Schwartz forwarded a cover letter and an abbreviated schedule to DiVito describing the present net cash value of the project as $31,673,000 based on a foreclosure and ownership of the project for a five year period. (Docket Entry # 8, ¶¶ 15

& 17 & Ex. E; Docket Entry # 16, ¶ 23 & Ex. F).

In early September 1991, FNBB received a report entitled "Restructuring vs. Foreclosure Consultation" from Ernst & Young ("restructuring report"). (Docket Entry # 8, ¶ 18 & Ex. G; Docket Entry # 13, ¶ 15; Docket Entry # 17, Ex. 19).[8] DiVito avers that the restructuring report forecasts a higher rate of return to FNBB and DnB under the proposed workout in comparison to a foreclosure. John W. Magee ("Magee"), President of Rockwood Realty Associates, Inc.,[9] attests that the restructuring report is "sketchier than what a bank should require in order to reach a decision regarding workout alternatives" and considers the report "fundamentally flawed." (Docket Entry # 15, ¶ 9). Magee further avers that using a more realistic percentage rate and applying the rate to both the workout and foreclosure options would result in an increased valuation of the foreclosure option. (Docket Entry # 15, ¶ 10).

On or about September 25, 1991, Ernst & Young provided FNBB with another report entitled "Agreed Upon Procedures Report" ("procedures report"). (Docket Entry # 8, ¶ 18 & Ex. F; Docket Entry # 13, ¶ 15; Docket Entry # 17, Ex. 18). DiVito avers that the procedures report indicates a higher rate of return to FNBB and DnB under the proposed workout than under a foreclosure. (Docket Entry # 8, ¶ 18).

Despite DnB's objections, on September 27, 1991, defendants entered into a workout of the Glades loan. (Docket Entry # 1, ¶ 15; Docket Entry # 4, ¶ 15; Docket Entry # 5, ¶ 18; Docket Entry # 8, ¶ 21; Docket Entry # 16, ¶ 27). Under the workout, Glades made an $8,000,000 payment on or about September 27, 1991, which reduced the outstanding indebtedness to $26,656,030. DnB apparently received its pro rata share of the above payment. The remaining $26,656,030

---

8. The restructuring report submitted by DnB differs from that submitted by defendants.

9. MaGee has been qualified to testify as an expert in similar matters in three separate court proceedings in the past two years. (Docket Entry # 13, ¶ 1).

was then divided into two "tranches."[10] Tranche A equaled $17,000,000 of the outstanding balance and Tranche B equaled $9,656,030 of the outstanding balance. Tranche A was repayable on October 1, 1996, at a 1% interest rate while Tranche B was repayable on October 1, 2011, at an amount contingent upon whether the project was sold prior to October 1, 2011. Two internal FNBB documents refer to Tranche B essentially as "debt forgiveness." (Docket Entry # 5, ¶ 19; Docket Entry # 13, ¶ 19; Docket Entry # 17, Ex. 23–25).

Magee opines under oath that foreclosing and holding the project for a five year period would result in a significantly higher rate of return to FNBB and DnB when compared to the restructuring plan of September 27, 1991. (Docket Entry # 15, ¶ 13). Since September 27, 1991, Tranche A has been current and DnB has received its pro rata share of monthly payments. (Docket Entry # 5, ¶ 20; Docket Entry # 8, ¶ 23; Docket Entry # 13, ¶ 20). As a result of the restructuring, Schwartz avers that DnB sustained an estimated loss in excess of $5,000,000. (Docket Entry # 16, ¶ 29).

DnB generally argues that defendants acted in contravention of paragraph 11. Defendants contend, in part, that they acted in accordance with paragraph 13 and that paragraph 11 does not apply in the context of a default.

### DISCUSSION

Summary judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Inferences are drawn in favor of DnB, the nonmoving party. *Space Master International, Inc. v. City of Worcester*, 940 F.2d 16 (1st Cir.1991); *Herbert W. Price v. General Motors Corporation*, 931 F.2d 162 (1st Cir.1991) (record viewed in light most favorable to nonmoving party).

■ In deciding whether a factual dispute is genuine, this court must determine whether "the evidence is such that a reasonable jury could return a verdict for the non-

moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992) (citing *Anderson* ). A fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Beck v. Somerset Technologies*, 882 F.2d 993 (5th Cir.1989) (citing *Anderson* ).

The participation agreement is governed by Massachusetts law. (Docket Entry # 1, Ex. A, ¶ 22). Defendants initially argue that paragraphs 11 and 13 are unambiguous and that they acted in accordance with the express terms thereunder.

"Under Massachusetts law, the 'interpretation of a contract is ordinarily a question of law for the court.'" *Rey v. Lafferty*, 990 F.2d 1379, 1384 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993) (quoting *Fairfield 274–278 Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir.1992)). "Only if the contract is ambiguous is there a question of fact for the jury." *Fairfield 274–278 Clarendon Trust v. Dwek*, 970 F.2d at 993.

■ Under Massachusetts law, parol evidence is inadmissible "to contradict the clear terms of an agreement, or to create ambiguity where none otherwise exists." *ITT Corporation v. LTX Corporation*, 926 F.2d 1258, 1261 (1st Cir.1991) (recognizing that whether contract provision is ambiguous presents a question of law). Thus, when an agreement is unambiguous the contemplations of the parties are generally irrelevant. *Fairfield 274–278 Clarendon Trust v. Dwek*, 970 F.2d at 994. The parol evidence rule does not otherwise bar "consideration of background facts that explain the context in which the agreement was made." *SAPC, Inc. v. Lotus Development Corporation*, 921 F.2d 360, 361 & n. 2 (1st Cir.1990); *see also Hermes Automation Technology v. Hyundai Electronics Industries Company, Limited*, 915 F.2d 739, 747 (1st Cir.1990); *Edmonds v. United States*, 642 F.2d 877, 881 (1st Cir.1981). In the event the court determines the agreement is ambiguous, however, the court may resort to extrinsic evidence to further ascer-

---

**10.** "Tranche" and "tranches" are not identified.

tain the existence of uncertainty. *See Fashion House, Inc. v. K Mart Corporation,* 892 F.2d 1076, 1083 (1st Cir.1989).

 Language within a contract "is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference[s] of opinion as to the meaning of the words employed and obligations undertaken." *Rey v. Lafferty,* 990 F.2d at 1384; *accord Fairfield 274–278 Clarendon Trust v. Dwek,* 970 F.2d at 993 (agreements generally presumed to express intent of the parties). "Where possible, words should be given their natural meaning, consistent with the tenor of contractual terms." *Fashion House, Inc. v. K Mart Corporation,* 892 F.2d at 1084. An agreement should be read as a whole and construed "to give a reasonable meaning to each of its provisions." *JRY Corporation v. LeRoux,* 18 Mass.App.Ct. 153, 464 N.E.2d 82, 87, *review denied,* 392 Mass. 1103, 466 N.E.2d 522 (1984); *accord Fashion House, Inc. v. K Mart Corporation,* 892 F.2d at 1084 (preferring construction of agreement as a whole).

 According to defendants, the construction of paragraphs 11 and 13 is unambiguous. Paragraph 11 applies to predefault situations and paragraph 13 governs postdefault situations. The third section of paragraph 11, i.e., "In all cases pertaining to default, Principal agrees to adhere to paragraph 13," as well as the title given to paragraph 13, i.e., "Loan Default Procedures," supports defendants' position.

Paragraph 13 provides that "in the event of default, courses of action will be agreed to by" the lending institution with the majority of dollars outstanding, i.e., FNBB. The paragraph also reads that FNBB "agrees to adhere to the Loan Documents for all appropriate remedies." (Docket Entry #1, Ex. A). Defendants maintain that the latter sentence is irrelevant inasmuch as it applies only when FNBB disagrees with the course of conduct adopted by the majority of lenders and, in this instance, FNBB is the majority entity. (Docket Entry #6).

According to defendants, paragraph 11 only applies to predefault situations. Defendants maintain that the paragraph makes plain that FNBB cannot reduce the amount of principal or release subordinate collateral without DnB's approval when the loan is not in default. For example, a predefault situation might encompass the circumstance in which FNBB wished to change the terms of the loan in order to make other loans to the same borrower. The primary arena in which loans are reduced and interest rates lowered, however, is in the context of an existing or imminent default. It is therefore somewhat illogical to assume that a bank would renegotiate the amount of principal, subordinate collateral and/or reduce the rate of interest if a loan was not in default. And a court should generally construe an agreement "to give reasonable effect to each of its provisions." *J.A. Sullivan Corporation v. Commonwealth,* 397 Mass. 789, 494 N.E.2d 374, 378 (1986).

Defendants additionally contend that applying paragraph 11 to default situations would make paragraph 13 apply only to administrative courses of action. This scenario is not necessarily the case. Rather, it is only the first sentence of the first section which would apply to administrative courses of action.[11] Section two would remain applicable to situations in which FNBB acquired title to collateral through foreclosure. Similarly, section three would continue to govern specific situations involving a purchase money mortgage instrument or security interest taken in part payment during the sale of collateral.

Defendants further submit that logic dictates that one party, i.e., the party with the largest amount of capital invested, must have the authority to decide the course of action in the event of default. Any other interpretation invites an impasse in which a minority owner has control over the actions of the majority owner, according to defendants. Defendants' argument, however, does not foreclose the parties from bargaining to insert a provision into the participation agreement requiring approval of both parties.

---

**11.** Paragraph 13 contains three separate paragraphs which, for clarity, this court refers to as sections. Similarly, this court refers to paragraphs within paragraph 11 as sections.

And it is generally true that a participating bank desiring to control modifications of a loan agreement should provide for its control in the participation agreement. *First Bank of WaKeeney v. Peoples State Bank*, 12 Kan. App.2d 788, 758 P.2d 236, 238 (1988) ("authorities state that a participating bank wanting control over decisions affecting modification or collection of loans ... must explicitly provide for that control in the participation agreement"). It is reasonable to construe paragraph 11 as constituting such a provision.

As indicated by its title, paragraph 11 applies to all instances in which FNBB, the principal, must obtain the consent of DnB, the participant. Use of the word "shall" demonstrates the mandatory nature of FNBB's obligation. The language of paragraph 11 does not expressly limit the paragraph to predefault situations. For example, the paragraph does not read "in all instances pertaining to default, only paragraph 13 shall control the actions of the parties." Nor does paragraph 13 contain a statement to the effect that "paragraph 11 shall not apply in the event of a default." While the paragraph can be construed in a manner to apply solely to predefault situations, alternatively the paragraph can be construed to apply in both predefault and postdefault situations.[12] Each construction is reasonably plausible. Consequently, this court finds the agreement ambiguous. This court therefore turns to extrinsic evidence to further ascertain and/or clarify the uncertainty between the two paragraphs.[13]

■ In light of his ten years of experience with real estate loans, Schwartz avers that provisions such as paragraph 11 typically apply throughout the life of the loan irrespective of default. (Docket Entry # 16, ¶¶ 6 & 7). He attests that it is rare for a bank to negotiate a reduction in principal or to release collateral except in the context of an imminent or existing default. (Docket Entry

# 16, ¶ 7). Schwartz's averment fails to establish as a matter of law, however, that paragraph 11 applies to default situations. Discovery is in its early stages and additional facts are necessary to ascertain the meaning of the interrelationship between paragraphs 11 and 13.

Summary judgment in defendants' favor is therefore inappropriate with respect to Count I. Count II alleges that defendants breached their fiduciary duty owed to DnB. In support of summary judgment, defendants assume for purposes of the motion that a fiduciary duty exists. (Docket Entry # 6, p. 12). This court will also assume *arguendo* for purposes of the instant motion that a fiduciary duty exists.

■ Under Massachusetts Law, the standard of duty generally owed by a fiduciary is one of "'utmost good faith and loyalty.'" *Wartski v. Bedford*, 926 F.2d 11, 13–14 (1st Cir.1991) (discussing fiduciary duty under Massachusetts law); *Leader v. Hycor, Inc.*, 395 Mass. 215, 479 N.E.2d 173, 177 (1985). Defendants submit three arguments in favor of summary judgment under Count II. First, defendants state there can be no breach inasmuch as paragraph 13 allows FNBB to determine the course of action in postdefault situations. As indicated above, however, the interrelationship between paragraphs 11 and 13 and whether paragraph 11 also applies to default situations is in dispute. Accordingly, defendants' first argument is unavailing.

■ Second, defendants argue that their actions were consistent with that of a fiduciary. Schwartz, however, avers that he was never told about any specific restructuring proposal prior to July 1991. (Docket Entry # 16, ¶ 16). BancBoston interoffice communications evidence that in February 1991 it and/or FNBB explored the possibility of restructuring the Glades loan contingent upon Claridge purchasing two properties owned by

---

12. For example, paragraph 11 can be viewed as a provision triggering the circumstances in which the participant's approval is required. After obtaining the participant's approval, paragraph 13 describes the specific conduct applicable to situations discussed in sections two and three.

13. Having examined the agreement as a whole, this court finds no additional guidance concerning the interrelationship between paragraphs 11 and 13.

a subsidiary of FNBB. (Docket Entry # 17, ¶¶ 6 & 7). In addition, Magee attests that the restructuring report is "sketchier than what a bank should require in order to reach a decision regarding workout alternatives." (Docket Entry # 15, ¶ 9). Magee further states that the analysis employed by Ernst & Young was flawed. (Docket Entry # 15, ¶ 9). The above evidence sufficiently establishes a genuine issue of material fact regarding whether FNBB acted with utmost good faith and loyalty.

Defendants' third argument parallels its second argument. Defendants maintain they exercised sound business judgment. In light of the foregoing evidence, however, and in particular Magee's affidavit, there exists a genuine issue of material fact regarding whether FNBB breached the fiduciary duty it allegedly owed to DnB.

As a final matter, defendants move for summary judgment under Count III. Defendants put forth two arguments: (1) that FNBB's conduct fell below the level of rascality required to violate chapter 93A; and (2) that the actions complained of did not occur primarily and substantially in Massachusetts. (Docket Entry # 6).

Although Chapter 93A does not provide a definition of unfair or deceptive conduct, the substantive standard of liability is often stated as conduct that falls " 'within at least a penumbra of some common law, statutory, or other established concept of unfairness,' or were 'immoral, unethical, oppressive or unscrupulous,' and resulted in 'substantial injury to competitors or other businessmen.' " *Logan Equipment Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1203–1204 (D.Mass.1990) (quoting *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975)). A section 11 claimant must show that the objectionable conduct attained " 'a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.' " *Quaker State Oil Refining v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir.1989) (citation omitted); *accord Kerlinsky v. Fidelity & Deposit Company of Maryland*, 690 F.Supp. 1112, 1119 (D.Mass.1987), *affm'd*, 843 F.2d 1383 (1st Cir.1988). A sim-

ple breach of contract action generally does not give rise to a Chapter 93A claim. *Canal Electric Company, et. al. v. Westinghouse Electric Corporation*, 406 Mass. 369, 548 N.E.2d 182 (1990).

Defendants argue that they treated their own money the same as they treated DnB's money. Viewing the facts in DnB's favor, the record indicates that FNBB excluded DnB from its negotiations with Glades in the spring and summer of 1991. The February 1991 interoffice communications (Docket Entry # 17, Ex. 6 & 7) intimate that, outside the presence of DnB, FNBB sought to restructure the Glades loan contingent upon Claridge purchasing two properties owned by a subsidiary. The circumstances surrounding this conduct as detailed in the Schwartz and Magee affidavits are sufficient to withstand summary judgment at this stage in the case. This court therefore finds a genuine issue of material fact exists as to whether defendants' conduct violated section 11 of chapter 93A.

Turning to the second argument, under section 11 of chapter 93A, the burden of proof is " 'upon the person [defendants] claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.' " *Omni–Wave Electronics Corporation v. Marshall Industries*, 127 F.R.D. 644, 649 (D.Mass.1989). As discussed in *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d 1260, 1264–1266 (1st Cir.1990), Massachusetts courts first look to the following three factors in determining whether the acts at issue occurred primarily and substantially within Massachusetts: (1) " 'where the defendant committed the deceptive or unfair acts or practices;' " (2) " 'where the defendant received and acted upon the deceptive or unfair statements' " and (3) " 'the situs of the plaintiff's losses due to the unfair or deceptive acts or practices.' " *Charles River Data Systems, Inc. v. Oracle Complex Systems Corporation*, 788 F.Supp. 54, 61 (D.Mass.1991) (quoting *Clinton*, 907 F.2d at 1265–66).

It is undisputed that DnB is a Norwegian banking corporation licensed to do business in the United States. (Docket En-

try # 1, ¶ 1; Docket Entry # 4, ¶ 1). In reply to defendants' argument that the actions did not occur primarily within Massachusetts, DnB fails to specify whether it is licensed to do business in Massachusetts.

It is also undisputed that FNBB and BancBoston have principal places of business in Boston, Massachusetts. (Docket Entry # 1, ¶¶ 2 & 3; Docket Entry # 4, ¶¶ 2 & 3). Correspondence and loan documents indicate that BancBoston had an office in Boca Raton, Florida and in Atlanta, Georgia (Docket Entry # 17) and is licensed to do business in Florida (Docket Entry # 8, Ex. B). The bulk of the correspondence contained in the record emanates to and from Boca Raton, Atlanta and Montreal, Canada.

DnB refers this court to exhibits 4, 6,[14] 7, 15, 17, 22, 26 through 29 and 33 attached to the affidavit of Laura Steinberg (Docket Entry # 17) as demonstrating that FNBB officials in Boston were involved intimately in the restructuring negotiations. The record, however, fails to fully support DnB's assertion. The record contains two letters addressed from Claridge to Thomas J. Hollister ("Hollister")[15] in Boston. (Docket Entry # 17, Ex. 15 & 17). Additional correspondence, however, fails to show that Hollister received the documents and/or was located in Boston. (Docket Entry # 17, Ex. 7, 22, 26, 27 & 29). The record also contains a September 3, 1991 facsimile transmission addressed to Rob Davis ("Davis"). Davis is not identified but his telephone is located in the 617 area code. (Docket Entry # 17, Ex. 28). In addition, the record also includes an interoffice communication addressed to Susan Beauchamp which refers to FNBB on the bottom of the first page. (Docket Entry # 17, Ex. 4).

Beyond citing the above exhibits, DnB simply asserts that the situs of the conduct is a question of fact and that DnB is entitled to proceed with discovery to establish that the conduct occurred primarily and substantially in Massachusetts. (Docket Entry # 14). It is worth noting that the November 1987 Assignment of Loan Documents from BancBoston to FNBB assigns BancBoston's rights to FNBB and identifies FNBB's mailing address as Boston.[16] (Docket Entry # 8, Ex. B).

In contrast to the above exhibits noted by DnB, defendants point to the following. Matonis is located in Florida where it prepared the Matonis report in July 1991. The project and loan collateral is situated in Boca Raton. The closing for the September 27, 1991 workout agreement occurred in Fort Lauderdale, Florida. DiVito, the account officer in charge of the loan on behalf of defendants, was located in either Boca Raton or Atlanta. Schwartz, the DnB official in charge of the loan since January 1991, corresponded with DiVito from New York. DnB's parent is located in Norway. (Docket Entry # 8, ¶¶ 7, 17, 21, 24, 25 & Ex. E).

Consequently, defendants maintain that DnB's alleged injury occurred in either Florida, New York or Norway. Defendants further argue that, despite the location of FNBB's home office in Boston, the intended force and input of defendants' activities was intended to influence DnB's behavior in Florida. (Docket Entry # 6).

Defendants put forth an extremely cogent argument. Under the factors recognized in *Clinton Hospital*, defendants committed the allegedly deceptive and unfair acts in either Florida or Atlanta. Correspondence originated from these locales. The purportedly deceptive negotiations took place between Glades, located in Florida, and DiVito, acting on behalf of FNBB, who was located in either Florida or Georgia. Matonis prepared the appraisal in Florida. It remains unclear where Ernst & Young formulated its reports although there is no indication that this took place in Massachusetts. The intended force

---

14. Exhibit six fails to refer to a Boston location.

15. DnB represents that Hollister is the head of BancBoston's restructured real estate department. (Docket Entry # 14, p. 19). As evidenced in answer to interrogatories, Hollister is identified as a person connected to BancBoston. (Docket Entry # 17, Ex. 33, Int. No. 5).

16. Under the participation agreement, notices are sent to BancBoston in Boca Raton and to DnC American in New York City. (Docket Entry # 1, Ex. A, ¶ 18).

and input of defendants' activities influenced the workout and financing for the project which was located in Boca Raton. Schwartz apparently learned of the allegedly deceptive activities in New York and corresponded with DiVito from this location. Schwartz also apparently relied, albeit erroneously, on the belief that defendants would advise and involve DnB in any negotiations with Glades.[17] The situs of DnB's losses was most likely either Florida (the location of the project) or New York (the location of DnB's offices).

This court therefore finds that defendants have met their burden in establishing for purposes of summary judgment that the actions and transactions at issue did not occur primarily and substantially in Massachusetts. At this juncture, there is no genuine issue of material fact concerning the fact that the bulk of activities and transactions occurred outside Massachusetts. Summary judgment on Count III in defendants' favor is therefore appropriate.[18]

II. *PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRY # 12)*

DnB moves for partial summary judgment on Count I of its complaint. (Docket Entry # 12). This court is mindful that its review of DnB's motion for partial summary judgment (Docket Entry # 12) is different than its review of Defendants' Motion for Summary Judgment (Docket Entry # 5). Viewing the record in defendants' favor and for reasons stated in part I, this court finds a genuine issue of material fact exists concerning whether paragraph 11 applies in the event of a default and the interrelationship between paragraphs 11 and 13. As explained in part I, certain provisions of the paragraphs are ambiguous. Summary judgment in DnB's favor under Count I is therefore improper.

### CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS** [19] that Defendants' Motion for Summary Judgment (Docket Entry # 5) be **DENIED** as to counts I and II and **ALLOWED** as to Count III. This court further **RECOMMENDS** [20] that plaintiff's motion for partial summary judgment (Docket Entry # 12) be **DENIED**.

---

17. At a March 1991 meeting with DiVito *in Florida*, Schwartz "stressed to DiVito that DnB wanted to be involved in all future substantive meetings that [FNBB] or BancBoston had with [Glades] concerning Loan repayment at maturity and/or an extension of the Loan." (Docket Entry # 16, ¶ 11).

18. Should subsequent discovery produce additional evidence that the actions and transactions occurred primarily and substantially in Massachusetts, DnB may move for leave to amend its complaint.

19. Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986).

20. See the previous footnote.