McHugh, J.
I.BACKGROUND
This is an action in which the plaintiff, Northeast Energy Services, Inc. (“Northeast”), seeks to recover certain sums from defendant, Andrew J. Lane (“Lane”), that Northeast claims are due under the contract between itself and Lane. The action came on for trial before the undersigned, sitting without a jury. Based on the agreed upon facts contained in the joint pretrial memorandum, the testimony and exhibits introduced during the course of the trial and the reasonable inferences I have drawn from those sources, I make the following:
II. FINDINGS OF FACT
Northeast is, in essence, a consulting engineering company. For years, Northeast, and its predecessor, NEES Energy, Inc., have been in the business of consulting with industrial clients about their energy consumption, making recommendations concerning the manner in which energy consumption could be reduced and installing equipment designed to aid in that reduction. For its services, Northeast typically charges a fee based on a percentage of the savings resulting from the equipment it installs.
Lane is in the business of property management and currently manages the Chapel Hill East apartment building in Framingham, Massachusetts (“Chapel Hill”). Lane is successor to the A.P. Lane Company.
In 1986, after some negotiation, Northeast undertook to examine ways in which Lane could reduce energy consumption at Chapel Hill. Ultimately, Northeast made recommendations to Lane and the two parties entered into a contract.[1] The contract was a standard form used by Northeast in all of its transactions with its customers modified somewhat to take account of Northeast’s actual transaction with Lane. The contract had a term of ten years. Under the contractual terms, Northeast was to receive 90% of the “energy cost savings” to Lane as those “energy cost savings” were defined and calculated under a formula the contract contained.
Certain terms of the contract have a central bearing on the current dispute and thus are helpfully reproduced here at some length. The first paragraph of the contract provided, in material part, as follows:
[Northeast] will provide energy management services to [Lane] designed to save energy through analysis of energy consumption and installation and management of energy control equipment, devices or materials at [Chapel Hill]. These services include:
(I) an energy audit of [Chapel Hill];
(ii) development of a program to save energy at [Chapel Hill];
(iii) installation at no cost to [Lane] of energy control equipment, devices or materials described in Attachment A (the System);
(iv) operation of the System by monitoring its performance, maintenance of the System by making appropriate adjustments, and providing appropriate training for [Lane’s] employees; and
(v) assistance in correcting any malfunctions to the System.
The System and all components thereof are the property of [Northeast] and will remain its property throughout the term of this Agreement. . .
Attachment A to the contract, describing the “System,” stated as follows:
1. Two new 100 ton electric chillers will be purchased and installed to replace the existing gas absorption chillers.
2. All of existing hallway lights will be replaced with new fluorescent fixtures, except in areas where the lighting would be reduced to unacceptable levels.
3. New HID lighting fixtures will be installed in the garage area to replace the existing high wattage incandescent lamps.
4. A computerized energy management system will be installed to control the boilers, chillers and pumps, as necessary.
The “chillers” mentioned in the first paragraph of Attachment A were integral components of Chapel Hill’s air conditioning equipment and used large amounts of energy when the air-conditioners were running. The computerized equipment referred to in the fourth paragraph of Attachment A was a sophisticated heating and air-conditioning monitor Northeast supplied to detect when a client’s air-conditioning or heating was not running at the optimal level and to make appropriate adjustments. That computerized equipment was a standard feature of the equipment Northeast customarily installed for all of its customers. In this case, however, Lane and Northeast agreed that Northeast would not install the computerized equipment and thus manually crossed out ¶4 on Schedule A.
*384 The second paragraph of the contract was designed to provide a mechanism for determining energy savings for purposes of calculating Northeast’s fee. The paragraph contained the parties’ agreement upon the actual number of kilowatt hours of electricity and hundreds of cubic feet of natural gas Chapel Hill had purchased in each month during the preceding calendar year and the number of heating degree days and cooling degree days experienced during each of those months.[2] The resulting historical calculations and data were referred to as the “Normalized Energy Use for the Base Period” and were attached to the contract as Attachment B.
Paragraph 2(b) of the contract provided in part as follows
“Normalized Energy Use” for any period shall be the amount of [Chapel Hill’s] energy usage for the period as shown by the applicable energy bills . . . meter readings, or other applicable measures, plus all sales, use, excise, gross receipts, property or similar taxes applicable to the services and the System provided by [Northeast] for such period, with a monthly adjustment for temperature variations and other changes as [Northeast] may reasonably deem appropriate to make the result fairly comparable to the Normalized Energy Use for the Base Period, as shown on Attachment B.
Paragraph 2(c) provided in part that “[i]n order to calculate the reduction in energy usage at [Chapel Hill] resulting from the operation of the System, [Northeast] may install metering apparatus to measure the energy usage.”
Paragraphs 2(d) and 2(e) provided as follows:
d. [Northeast] will calculate the reduction of energy usage each month resulting from the operation of the System by subtracting the Normalized Energy Use for that month from the Normalized Energy Use for the equivalent month during the Base Period. The balance after this calculation is the energy savings for that month (the Energy Savings). The Energy Savings for a month shall not be less than zero.
e. For purposes of billing under Section 3, [NortheastI will convert Energy Savings from units of energy to the dollar value for such units of energy (the Energy Savings Revenue). In making such conversion, [Northeast] will use the most current rates charged by [Chapel Hill’s] energy suppliers for units of energy.
Several other provisions of the contract are noteworthy. Paragraph 3, dealing with billing, provided that Northeast would submit monthly bills to Lane, that Lane would pay those bills promptly and that those bills would show the “Energy Savings Revenue” for the month covered by the bill. Northeast was to receive 90% of the Energy Savings Revenue for its fee. Paragraph 6 of the contract provided for upward or downward adjustments to the base period levels if Lane installed new equipment or devices at Chapel Hill. Paragraph 12 gave both parties a right to terminate the agreement before its expiration date. If Lane terminated the agreement, however, then Lane was required to pay an “early termination amount” contained in Attachment C to the contract. The amount of the “early termination amount” decreased with each year of the contract’s existence and was designed to provide Northeast with its anticipated profit for the remaining period of the contract reduced to “present value” at the time of termination. Finally, Paragraph 16(f) provided that
No action, regardless of form including arbitration, arising out of this Agreement may be brought by either party more than two years after the cause of action has arisen.
On conflicting evidence that would warrant a finding to the contrary, I find, contrary to the testimony of Mr. George Sakallaris, that Northeast’s computerized energy management equipment was an integral part of the System for which Northeast’s standard contract was designed and around which it was written. Construed as a whole, and construed in a manner that gives to all of its constituent parts a cohesive and integrated life, Northeast’s standard contract contemplated Northeast’s assessment of its customer’s energy needs, installation of energy-saving hardware, training of the customer’s employees in proper and sound operation of that hardware, realization for ten years by both parties of the savings resulting from use of the hardware and the customer’s operation to purchase the hardware at the end of the ten-year contractual term. The contractual formula for measuring energy savings, and thus the revenues that Northeast would earn, was a formula rationally related to the fact that the contract contemplated installation of a sophisticated, comprehensive computerized system for monitoring and operating at maximum efficiency the customer’s heating and air conditioning systems and installation of other hardware designed to reduce the customer’s overall energy use.
It was in the foregoing context that Northeast’s standard contract presumptively attributed changes in energy use to the equipment Northeast installed. Indeed, the contract contained provisions for revenue adjustments if Northeast’s customer failed to use the Northeast equipment in a proper and appropriate fashion or made other changes to the property that increased energy usage. The contract also contained a provision for the customer to segregate from overall decreased energy usage any decrease that, in the customer’s view, flowed from causes unrelated to the equipment Northeast had supplied.
Although the pricing provisions of Northeast’s standard contract were designed for use in situations where a customer utilized Northeast’s computerized energy management equipment, neither Northeast nor Lane changed those pricing provisions when the computerized equipment was deleted from the equipment Northeast undertook to supply to Lane. Both Lane and Northeast were sophisticated, commercial enterprises and both were fully capable of reading and compre *385 hending the interrelationship of the provisions the contract contained as written.
Performance under the contract began in July of 1986. Northeast installed two new electric “chillers” to replace the gas "chillers” that had been at the heart of Chapel Hill’s air conditioning system. That change increased Chapel Hill’s monthly electric consumption by the amount necessary to run the chillers but simultaneously decreased Chapel Hill’s consumption of natural gas. The chillers were separately metered so that the exact amount of electricity attributable to their operation could be determined each month. In addition, Northeast installed 252 fluorescent light fixtures in Chapel Hill’s hallways by October of 1986 and, by March of 1987, installed 71 new and more energy efficient lighting fixtures in the garages.
Each month Northeast rendered a bill to Lane. The bill separately calculated and displayed energy savings for natural gas and for electricity. For electricity, the bill displayed the amount of electricity consumed during the month by the new electric chillers, the amount of decreased electricity consumption attributable to the new lighting fixtures[3] and the “additional electric savings” for the month. The “additional electric savings” were determined by adjusting Lane’s actual electric consumption for the month to account for increased heating or cooling degree days over those in the base period, for the increased electric energy used by the chillers and for the decreased energy used by the new lighting fixtures[4] and then subtracting that adjusted figure from Lane’s base period electric consumption for the corresponding month. The resulting difference was the “additional electric savings” for that month.
The amount reflected on each month’s bill for “Decrease Due to New Hallway Lighting” was a constant because that amount simply showed a readily ascertainable difference between the energy the old lighting fixtures consumed and the energy the new fixtures consumed assuming that both sets of fixtures operated 24 hours each day.[5] Nevertheless, if a monthly bill showed “additional energy savings” of zero or less, Northeast did not bill Lane for any electric savings of any kind for that month. If a monthly bill showed some “additional electric savings,” however, then Northeast billed Lane for the “additional electric savings” plus the “decrease due to new hallway lighting” for that month. As a consequence, in many months Lane was not charged for any decreased electric energy usage because its total electric consumption for the month was greater than the electric consumption in the base period even though its electric consumption for lighting was in fact less than its base-period consumption.
The portion of Northeast’s bill reflecting natural gas savings was calculated more simply. Northeast simply subtracted the actual adjusted natural gas consumption for the billing month from the gas consumption during the corresponding month in the base period. If the difference was zero or less, Northeast billed Lane nothing for natural gas savings during that month. If the difference was positive, however, Northeast billed Lane for 90 percent of the savings.
In fact, Lane realized no electric savings from installation of Northeast’s “System” apart from the savings attributable to the new lighting fixtures. The actual amount of the savings Lane realized is the amount shown on Northeast’s monthly bills with the corrections discussed in note 5, supra. During the winter months when the chillers were not operating, those electric savings were the only savings Northeast’s “System” actually yielded. During months when the chillers were operating, the amount of Lane’s actual savings can be approximated by adding the savings from the lighting fixtures to the difference between the “natural gas” savings and the cost of additional electricity needed to operate the chillers. I say “approximated” advisedly because several devices at Chapel Hill in addition to the chillers operated on natural gas. Accordingly, differences between Lane’s natural gas consumption during a base period month and its actual natural gas consumption during a billing month did not necessarily result entirely from shifting the chillers from electricity to natural gas.
In any event, Northeast sent its monthly bills to Lane and Lane routinely paid them. When the contract was entered and for a time thereafter, Lane had a great number of employees, received a great number of bills from a great number of vendors and spent little or no time reviewing each bill as it was received. In February of 1991, however, Lane was operating far fewer enterprises and began to pay closer attention to the bills he was receiving. He then reviewed current and historic Northeast bills, concluding as a result that he had been overcharged in the total amount of $104,380.71. Accordingly, he refused to pay any bills Northeast rendered to him thereafter.
Lane computed the amount of Northeast’s alleged overcharge by totaling all of the amounts he had been charged for “additional electric savings” and all of the amounts that he had been charged for natural gas savings during months when the chillers were not operating. He contended those categories of “savings” could not possibly be attributed to the “System” Northeast had installed. In calculating the alleged overcharges, however, Lane did not credit Northeast with savings that in fact had resulted from the new lighting fixtures during those months when the “additional electric savings” were zero or less and Northeast had billed him nothing for those electric savings.
The contract continued although Lane refused to pay Northeast’s bills. Northeast continued to calculate its bills in the manner it had calculated them previously and Lane continued to calculate the amount he claimed to owe in the manner just described. Between February, 1991, and June of 1993, when the parties terminated the contract,[6] Lane contends that the amount he actually owed Northeast was *386 $88,442.23 instead of the substantially greater amount Northeast actually billed.
As stated, the parties terminated the contract in June of 1993. Lane contends that Northeast owes him the sum of $15,938.48, the difference between the amount he claims to owe Northeast for the period after January of 1991 and the amount he claims Northeast overcharged him during earlier periods. Northeast, claiming that its calculations reflected a proper interpretation of the contract, claims that it is owed a total of $196,660.09.
In fact, as of June of 1993, when the contract was terminated, the total energy savings, calculated in accordance with the manner the contract provided, amounted to $507,074. Ninety percent of that amount is $456,366.60. The early termination amount that Lane was required to pay Northeast as a consequence of terminating the contract after seven years was $85,100. Calculated in accordance with the contractual provisions, Lane’s total principal obligation to Northeast as of June of 1993 thus was $541,466.60. Against that sum, Lane had paid $291,675.82 and was entitled to a credit in the amount of $272.83 for Northeast’s billing errors.[7] When those payments are taken into account, Lane’s obligation to Northeast as of the end of June of 1993 amounted to $249,517.95. The parties agree that Lane is entitled to an offset against that amount of $52,857.28[8] and that offset reduces Lane’s obligation to $196,660.67. That amount is subject to interest at the contractual rate of 18% per annum. The relevant interest as of August 1993, when this action was tried, is $31,943.18.[9]
III. CONCLUSIONS OF LAW
Against the foregoing backdrop, the primary issue this case presents is whether the contract between Lane and Northeast, fairly and properly interpreted, provides that Lane is to pay Northeast the amount by which Lane’s adjusted gas and electric bills for Chapel Hill during any month of the contract term were less than the gas and electric bills during the corresponding month of the base period even if the decrease did not result from the “System” Northeast installed at Chapel Hill. Lane claims that the answer is “No” and Northeast claims that the answer is “Yes.” Northeast is correct.
In the last analysis, the contract contains a provision for measuring energy savings that does not fit tightly with the product Northeast actually supplied to Lane. But this was a contract between two sophisticated parties and there is no reason why they should not have been permitted to use any measuring device they chose in order to determine the amount of money Lane would pay Northeast for its services. The mechanism the parties chose was simply the difference between the amount of energy consumed in the base period and the adjusted amount of energy consumed in the billing period.[10]
It may be that interpreting the contract in the foregoing fashion produces what turns out to be a very hard bargain.[11] Absent fraud, mistake or unconscionable results, none of which have been shown to exist here, however, the Court has no power to relieve parties from the consequences of a hard bargain. See Raldne Realty Corp. v. Stern, 319 Mass. 726 (1946) (rescript).
Lane’s contention that courts must construe a contract with reference to the situation of the parties when they made the contract and the objects they sought to accomplish so as to give a reasonable effect to each of the contractual provisions is correct. See Shay v. Bay State Gas Co., 383 Mass. 218, 222-23 (1981). So, too, is Lane’s contention that where two elements in a contract produce conflict when read together but consistency when one is read as qualifying the other, the latter reading, if otherwise reasonable, is favored. JRY Corp. v. LeRoux, 18 Mass.App.Ct. 153, 160, review denied, 392 Mass. 1105 (1984).
Application of those principles to the present situation, however, does not produce the result for which Lane argues. The parties agreed that Northeast would receive 90% of the savings from Northeast’s “System.” There were any number of ways to measure the amount of those savings. They chose a method that over ascribed savings to the “system.” But the essential point is that the parties chose it. Neither side concealed anything from the other. The problems with the measuring system that Lane points out now were problems apparent to anyone who read the contract in the context of the equipment Northeast agreed to supply Lane. To be sure, viewed from Lane’s standpoint, this contract had every appearance of a bad bargain. But that, too, was something a simple reading of the contract itself would have revealed.[12]
ORDER
In light of the foregoing, it is hereby ORDERED that judgment enter in favor of plaintiff, Northeast Energy Services, Inc., against defendant, Andrew J. Lane, in the amount of $223,603.85 plus interest on $196,660.67 at the rate of 18 percent per annum commencing September, 1993.

The contract between the parties to this action actually was entered by their respective predecessors in 1986. There is no question, however, that the current parties have succeeded to all of the contractual rights and liabilities of those predecessors. The precise details of the succession are therefore irrelevant. Unless the precise identity of one of the predecessors is material, therefore, I shall refer to the parties throughout this opinion, for simplicity’s sake, as “Northeast” and “Lane.”

Heating and cooling degree days are days on which the temperature was above or below sixty-five degrees Fahrenheit. One degree below sixty-five degrees Fahrenheit for one day is one heating degree day. Ten degrees below sixty-five degrees Fahrenheit is ten heating degree days.

On all of Northeast’s monthly bills after March, 1987, the savings from the new garage and hallway lighting are reported together under the heading “Decrease Due to New Hallway Lighting.” Despite the label, the calculations accompanying each bill reveal that the reported energy savings flowed both from the hallway and from the garage lights.

The “decrease due to new hallway lighting” was added to the month’s consumption because the monthly bill reflected that decrease separately. As a result, failure to add that *387 decrease to the actual electric ¿onsumption before calculating “additional electric savings” for the month would have resulted in a double billing.

Actually, the bills reflect four different constants. The first was 11,169 kilowatt hours. That was the amount of savings attributable solely to the hallway fixtures before the garage fixtures were installed. Beginning when the garage fixtures were in place in March of 1987, the bills reflect 16,182 kilowatt hours to take account of the savings from the hallway fixtures and the garage fixtures. The third constant, beginning in June of 1987 was 14,667 kilowatt hours resulting from Northeast’s realization that the figure of 11,169 kilowatt hours resulted from a mechanical error in calculating the savings attributable to the hallway lighting. The fourth and final change appeared in the bill for September of 1988 and reduced the constant to 19,293 kilowatt hours. That change resulted from Northeast’s realization that its earlier calculations were based on months consisting of 31.5 days when it should have been using months consisting of 30.5 days. At all times after September of 1988, 14,293 kilowatt hours was the constant attributable to savings resulting from the hallway and garage lighting.

The parties agree that Lane made a payment to Northeast in connection with the termination and that, if Northeast recovers in this action, Lane is entitled to a credit against that recovery in the amount of $52,857.28 to reflect that payment.

see note 5, supra.

see note 6, supra.

The accrued interest is less than 18 percent of the total unpaid balance because constituent parts of the unpaid balance became due and payable at different times. Cf. Sterilite Corp. v. Continental Casualty Co., 397 Mass. 837, 841-42 (1986).

In fact, Lane’s contention with respect to how the contract should be interpreted is no more “logical” than Northeast’s. Lane argues that he is obligated to pay Northeast for electric energy savings only during those months when Lane’s adjusted electrical energy consumption was less than its electric energy consumption during the relevant base period. In those months, however, Lane contends he is obligated to pay only for the energy savings resulting from Northeast’s installation of electric fixtures. In months when the adjusted energy consumption was greater than his consumption during the base period, Lane contends that he is obligated to pay nothing even though the savings he achieved from installation of the lighting fixtures was a constant that existed every month. In Lane’s view, therefore, the trigger for his obligation to pay was wholly unrelated to the savings for which he was paying. Northeast’s construction similarly disconnects measured savings from Lane’s payment obligation but, unlike Lane’s, does so in a manner consistent with the contractual language.

Although the present record would support that conclusion, the present record is not complete. Northeast, after all, paid for and installed the chillers as well as the light fixtures. Northeast was responsible for maintaining that equipment throughout the contractual term. The record does not reflect Northeast’s capital outlay or maintenance costs. Without those, any accurate conclusion regarding who got the better deal would be impossible.

The foregoing conclusion moots Northeast’s claim that the contract barred Lane from asserting any alleged billing errors over two years old. It is, however, doubtful that, at least to the extent that they were raised defensively, the contractual provisions any of Lane’s claims regarding overcharges. Cf. Bose Corporation v. Consumer’s Union of the United States, 367 Mass. 424, 426-27 (1975).